No. 57,973

STATE OF KANSAS, *Appellee,* v. JOEL D. JACKSON, *Appellant.*

(714 P.2d 1368)

Opinion filed February 21, 1986.

*Daniel E. Monnat,* of Fisher & Monnat, of Wichita, argued the cause and *Stanley Spurrier, III,* and *Orval L. Fisher,* of the same firm, were with him on the brief for appellant.

*Geary N. Gorup,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Clark V. Owens,* district attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

HERD, J.: This is a criminal action. Joel D. Jackson was con-

victed by a jury of attempted first-degree murder (K.S.A. 1984 Supp. 21-3301 and K.S.A. 21-3401) and aggravated kidnapping (K.S.A. 21-3421).

Joel Jackson rented stalls at Sunflower Farms where he boarded horses owned by himself and his mother. The victim, Denise Picard, was employed as a horse trainer at Sunflower Farms. Her duties included feeding, grooming and training the owners' horses and cleaning stalls. At the time of the incident, Denise lived in a one-room apartment built inside the barn.

Prior to the incident which resulted in appellant's conviction, a number of antagonistic exchanges had taken place between him and the victim which resulted in the victim's being afraid of him.

Jackson continually criticized Denise's work, telling her she wasn't doing things properly and that if she couldn't handle the job, she should quit. Denise's fear of appellant and his harassment drove her to tears on many occasions. Frequently Jackson would ask Denise's supervisor, Fred Oden, to fire Denise and to hire him. He was told by Mr. Oden that Denise was progressing fine in her work and he was not ready to hire anyone else. By early April of 1984, appellant's dislike for Denise had taken on a more menacing tone, when he told Mr. Oden, "Denise better not never mess with me because if she do, I'll cut her up." Mr. Oden told appellant that if he was going to talk like that, he should load up his horses and leave.

On the morning of April 20, 1984, Joel Jackson drove to Sunflower Farms, where Denise was helping the owners of a sick horse. Jackson told Denise his mother was bringing two more horses out that day and he was going to bring out a stud as well. Denise told him he would have to wait until the following Monday because there was no additional room in the stables. She also explained she couldn't put a stud with the other horses or the horses would fight. They argued over this matter for a few minutes until appellant finally gave up and walked away.

Jackson's story differed from that of Denise. He testified that after arriving at Sunflower Farms, he began checking horses in various stalls. He claimed Mr. Oden had asked him to keep an eye on things while he was away. Mr. Oden and the owners of Sunflower Farms were at a horse show in St. Louis at the time of the incident. He further testified Denise asked him to look at a

sick horse and after a conversation about the horse, some new boarders arrived at the barn. He said he left shortly thereafter, and he and Denise did not argue that morning.

After leaving Sunflower Farms, Jackson went to work at the China Inn restaurant in Wichita. While he was cutting vegetables at work that morning, he asked his boss, Bill Mar, to sharpen a knife. The knife had a plastic handle and a six-inch blade. Mr. Mar noticed the following day that a knife similar to the one that he had sharpened for Jackson the morning before was now missing. A knife of the same type was used in the attack on Denise.

After working through the noon hour, appellant received permission from Mr. Mar to leave. He was scheduled to return to work at 5:00 that evening. Before he left the China Inn, Mr. Mar asked him to pick up some supplies for the restaurant and gave him $150 with which to purchase them. Appellant picked up the supplies and then drove back out to Sunflower Farms.

According to Denise, Joel Jackson returned to Sunflower Farms at about 2:40 p.m. that afternoon. Denise was there alone at the time. She was hand-spreading straw in the stalls when she saw appellant's car back up to the west entrance of the barn. After about five minutes, appellant came into the barn and began looking into the stalls. Denise asked him if he was still waiting for his mother to bring out the horses, but he did not respond. Denise then started for the hallway leading to the west exit from the barn. Appellant followed her.

When she reached the pop machine in the hallway, appellant reached out and grabbed her hair with his left hand. He pulled a plastic-handled knife with a five- or six-inch blade from inside his coat, and cut the right side of her throat. Denise fell to her knees while Jackson continued to stab her throat and the right side of her head. She attempted to block the knife with her hands, resulting in numerous cuts to her hands. Appellant then began to pull and drag Denise towards the west exit. When they were within two feet from the door, he threw the knife back inside the barn, reached in his right-hand pocket and got out his car keys, all the while still holding on to Denise's hair. Upon reaching the doorway, he opened the trunk of his car and attempted to push Denise into the trunk. Her resistance was strong

however, and he was able to get only her right hand and her head into the trunk.

Appellant then pulled Denise back inside the barn, pushed her down, took off his coat and threw it in the middle of the hallway. He retrieved the knife and began stabbing her again, five or six times. Denise was able to break away from her assailant momentarily, but he got hold of her again and pleaded with her to get into the trunk of his car.

After again unsuccessfully attempting to get Denise into the trunk, he slammed the trunk lid on her head three or four times. By grabbing his leg, Denise was able to get entirely out of the trunk so that it slammed shut. She then grabbed the keys from the trunk and threw them. Appellant released her to retrieve his keys and she was thus able to run across the porch and down the road. She ran behind a wire fence for protection until his car went by her. She then ran back to the barn and drove to the closest business for help.

Jackson's version of these events is essentially that Denise made sexual overtures to him which he spurned, prompting Denise to hit him in the back with a pitch fork. He then claims he "blacked out" and the next thing he remembers is he was standing next to Denise at the pop machine and observed that she was bleeding. He claims she then started yelling and screaming and ran out the front door of the barn. He says he followed her a short distance but could not catch her so he got into his car and left "very fast."

Jackson drove to his mother's home in El Dorado and, upon arriving there, told his mother he had been in a "terrible fight." He then called a friend in California, who advised him to contact an attorney. He called attorney Jim Hargrove, and with his attorney's help, surrendered himself at the Butler County sheriff's department that evening.

Jackson was charged with aggravated kidnapping, attempted first-degree murder, and aggravated battery. The aggravated battery charge was later dismissed upon motion of the State.

At trial, Jackson presented an insanity defense. The jury found him guilty of aggravated kidnapping and attempted first-degree murder. After reviewing a report of appellant's examination and evaluation at Larned State Security Hospital, the trial judge sentenced him to fifteen years to life for attempted first-degree murder and to life imprisonment on the charge of aggravated

kidnapping, with sentences to run consecutively. This appeal followed.

The appellant first claims error in the trial court's failure to give a jury instruction on the defense of diminished capacity. The appellant argues the doctrine of diminished capacity is recognized and applied in Kansas despite statements to the contrary in a number of opinions by this court.

Appellant's argument centers on our holding in *State v. Dargatz*, 228 Kan. 322, 614 P.2d 430 (1980). In *Dargatz*, we specifically rejected the doctrine of diminished capacity. However, we also stated:

"Although a mental illness or defect not amounting to legal insanity is not a defense, since, for purposes of the capacity to commit crime, degrees of mental abnormality are not recognized, where the crime charged requires a specific intent, evidence of a mental defect which negates the specific intent is admissible." p. 332.

Appellant argues that by allowing evidence of a mental defect which negates specific intent, we have, in effect, adopted the doctrine of diminished capacity. This statement is true. However, under our rule, diminished capacity may be used only to negate specific intent, not to remove criminal responsibility. Appellant goes on to argue that under such circumstance the jury should have been instructed that evidence of mental disease or defect not amounting to legal insanity may be considered in deciding whether the defendant formed the specific intent necessary for the crimes charged.

We rejected the argument for such instruction in *State v. Grauerholz*, 232 Kan. 221, 654 P.2d 395 (1982). There, we reaffirmed *Dargatz*, noting that while *evidence* of mental defects is admissible, an *instruction* on diminished capacity was not proper since we have not adopted the defense of diminished capacity. Similarily, in *State v. Topham*, 231 Kan. 167, 170, 642 P.2d 986 (1982), we held that since we have rejected the doctrine of diminished capacity, the defendant was not entitled to an instruction permitting the jury to consider whether the defendant, although legally sane, was deprived of the mental ability to form the requisite specific intent. Thus, instructions on lesser included offenses were not required.

In addition to *Topham* and *Grauerholz*, we have recently reiterated our holding in *Dargatz* in *State v. Wood*, 235 Kan. 915, 686 P.2d 128 (1984).

Our statements in the foregoing cases are misleading: we reject the doctrine of diminished capacity yet permit the admission of evidence of diminished capacity in specific intent crimes. The admission of such evidence for the limited purpose of a partial defense against the specific intent of the crime is the doctrine of diminished capacity or—as designated in many jurisdictions—diminished or partial responsibility. In Lewin, *Psychiatric Evidence In Criminal Cases for Purposes Other Than the Defense of Insanity,* 26 Syracuse L. Rev. 1051, 1060 (1976), Professor Travis Lewin discussed the scope of the partial responsibility defense:

"Partial responsibility is a defense only in specific intent cases. Specific intent crimes are those in which, as one of the essential elements of the offense, the prosecution must prove beyond a reasonable doubt that the defendant entertained a specific objective or engaged in certain specified mental activity. Examples of specific intent crimes range from aggravated homicides requiring proof of premeditation, deliberation and a design to effect death, through larceny offenses which require proof that the defendant intended to permanently deprive an owner of personalty of his right to possession, to conspiracy, attempted crimes and all offenses based upon accessorial liability. If for any reason the defendant did not entertain the particular mental state, then he did not commit that crime, although he may, of course, have committed some other or lesser crime not requiring that particular state of mind."

Thus, it is apparent we have adopted the doctrine of diminished capacity in spite of our past disclaimers. Evidence of diminished capacity is admissible only for the limited purpose of negating specific intent and is not a substitute for a plea of insanity. Where insanity is relied upon, the jury must first determine that issue. If it finds the defendant sane, it may then consider, where appropriate, evidence of diminished capacity as a defense to a crime requiring proof of a specific intent. Whether the jury should be instructed on diminished capacity is left to the sound discretion of the trial court. Here the court gave PIK instructions on intent, lesser included offenses and epilepsy. We consider the instructions in this case adequate to apprise the jury of appellant's case. We find no error.

Appellant next contends the trial court's refusal to instruct the jury on the defense of diminished capacity constituted a denial of equal protection in light of the fact that a jury instruction is allowed upon the partial defense of voluntary intoxication.

K.S.A. 21-3208(2) provides that evidence of voluntary intoxication may be considered when a specific intent or state of mind

is a necessary element to constitute a particular crime. Thus, we have held that where the crime charged requires a specific intent, voluntary intoxication may be a defense and instruction thereon is required where there is evidence to support such a defense. *State v. Sterling*, 235 Kan. 526, 529-30, 680 P.2d 301 (1984).

The fact that we have required an instruction on voluntary intoxication is merely a response to the legislature's enactment of K.S.A. 21-3208(2) and an attempt to carry out the purpose of the statute. As we have already determined, the trial court's failure to give an instruction on diminished capacity was not prejudicial since this theory was adequately covered by general instructions given by the trial court. This issue is without merit.

Appellant next contends the evidence was insufficient to support a conviction of attempted first-degree murder.

The crime of attempted first-degree murder requires proof that the defendant acted "maliciously, willfully, deliberately and with premeditation." K.S.A. 21-3401. Appellant argues there was insufficient evidence to establish premeditation, deliberation and intent to kill in the instant case.

When the issue of the sufficiency of the evidence to support a conviction is raised, the standard of review on appeal is whether the evidence, when viewed in a light most favorable to the prosecution, convinces the appellate court that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. The appellate court looks only to the evidence in favor of the verdict to determine if the essential elements of the charge are sustained. *State v. Zuniga*, 237 Kan. 788, 794, 703 P.2d 805 (1985).

The evidence presented at trial demonstrated there had been animosity between the appellant and the victim for some time prior to the attack, due in part because the victim had a job which the appellant desired. The appellant had harassed the victim on a number of occasions and the victim's supervisor had witnessed this harassment. Not long before the attack, the appellant had threatened the victim, telling her supervisor he would "cut her (the victim) up" if she caused him any trouble.

The appellant was aware the victim would probably be alone the day of the attack, since he knew that her supervisor and the owners of Sunflower Farms were in St. Louis that day. On the

morning of the attack, the appellant had asked his employer to sharpen a knife for him. His employer noticed the next day that a knife similar to the one he had sharpened for appellant was missing. A knife of that same type was used in the attack on the victim.

The victim was slashed and stabbed repeatedly with the knife. The evidence indicated that upon arriving at Sunflower Farms that afternoon, appellant had backed up his car to the door of the barn. He later attempted repeatedly to force the victim into the trunk.

Although the appellant testified that prior to his "blackout," he remembered the victim stabbing him with the pitchfork, the appellant bore no bruises, scratches or other indications of an attack on his person.

A review of the evidence makes it clear a rational factfinder could have found the appellant guilty of attempted first-degree murder beyond a reasonable doubt and the evidence was sufficient to support the jury's verdict.

The appellant next argues the evidence was insufficient to establish the independent crime of aggravated kidnapping. The appellant makes three separate arguments relating to this issue: (1) The appellant lacked sufficient control over the victim for there to be a taking or confinement; (2) the appellant lacked sufficient intent; (3) the acts upon which the aggravated kidnapping charge was based occurred during a prolonged struggle between the victim and the appellant and were merely incidental to the charge of attempted murder.

The aggravated kidnapping charge arose out of the victim's testimony that the appellant twice attempted to push her into the trunk of his car.

The appellant first argues he failed to exert sufficient control over the victim for there to be a "taking or confining" as required by the kidnapping statute, K.S.A. 21-3420. While it is true the appellant was not successful in getting the victim locked inside his trunk, such control is not necessary.

In *State v. Mahlandt*, 231 Kan. 665, 647 P.2d 1307 (1982), the defendant was convicted of robbery and aggravated kidnapping arising out of two separate convenience store incidents. After robbing the first store, the defendant forced the female cashier to leave the store. She put up a struggle and he hit her in the face

and head several times. The defendant placed the victim in his car, but she was able to escape.

As in the instant case, the defendant in *Mahlandt* argued his actions constituted only attempted kidnapping, since his victim escaped. We held as follows:

"The issue here turns on the degree of asportation required to constitute a 'taking' under the statute. In *State v. Buggs*, 219 Kan. 203, 214, 547 P.2d 720 (1976), this court construed the statute as requiring no particular distance of removal, nor any particular time or place of confinement. Rather, it is the fact and not the distance of the taking that supplies the necessary element of kidnapping.

"Here the evidence was sufficient to establish an actual taking of the victim. Either the defendant was guilty of kidnapping under the statute or he was not guilty, depending on the jury's belief of the evidence. There was no evidence of an attempt to kidnap.

"The uncontroverted evidence here shows that the victim was forced from the store despite her attempt to fight and get away, and was physically placed by the defendant in his car. It was only after the defendant went around to the other side of his car to get in, and started up the car to drive away that the victim was able to escape. Once the defendant secured the victim in his car it is clear that she was under his control and a taking had occurred." 231 Kan. at 671.

Appellant here argues our holding in *Mahlandt* requires the defendant to have completely secured the victim in his car in order for a "taking" to have occurred. We do not agree.

The facts of the instant case are similar to those in *State v. Royal*, 234 Kan. 218, 670 P.2d 1337 (1983). There, the defendant was convicted of aggravated burglary, aggravated battery and aggravated kidnapping, arising out of two separate incidents. In the second incident, the defendant approached the victim while she was in the parking lot of her apartment building, standing next to her car. He grabbed her around the neck, held a knife to her throat, and dragged her to his car. She fell down and briefly lost consciousness. While the defendant was placing her in his car from the driver's side, she regained consciousness, resisted and escaped. As in *Mahlandt*, the defendant argued the trial court should have instructed on attempted kidnapping. We held:

"Here, the taking or confinement is alleged to have been done to facilitate the commission of the crime of aggravated battery or rape. Ms. Harper was dragged a distance of some forty feet from her car across the parking lot to the defendant's vehicle. She explained that she fell down and evidently was knocked out; when she regained consciousness, the door on the driver's side of the defendant's car had been opened, and 'he had me past the open door and was pushing me into the car, into the driver's side of the car.' The defendant had the victim entirely under his control. He removed her from a well-lighted public place into the

interior of his vehicle. That she kept fighting and screaming, and eventually was able to break away, does not lessen the offense." *State v. Royal,* 234 Kan. at 223-24.

The key factor in both *Mahlandt* and *Royal* was not that the victim was pushed completely inside the car. Rather, the court emphasized the defendant's *control* over the victim.

The victim in the instant case was twice dragged by the appellant from inside the stables to the appellant's car, which was backed up to the door outside. While the appellant was not successful in getting her completely inside the trunk, it is clear she was under his control. The fact that the victim was able to escape does not prevent the appellant's conviction for aggravated kidnapping.

The appellant also maintains the evidence was insufficient to show he acted with the intent "to facilitate flight or the commission of any crime" or "to inflict bodily injury" on the victim, as required by K.S.A. 21-3420.

Specifically, appellant points to the fact that he and the victim were already in a secluded place, and appellant knew the owners and trainer were out of town. He argues that forcing the victim from the barn to his car could only have increased his risk of detection. Thus, the appellant argues his forcing of the victim from the barn to the car could not have been done with the intent to facilitate the commission of a crime.

Applying the standard of review earlier set out, we find the evidence was sufficient to find the appellant intended to either inflict further bodily injury on the victim or to facilitate the commission of his crime by hiding the victim's body and fleeing.

Appellant next contends under this issue that there was a continuous and extended struggle giving rise to the charge of attempted murder. Thus, he argues the acts allegedly constituting kidnapping were merely incidental to the former charge and did not have as their purpose the facilitation of the commission of a crime.

The appellant relies on *State v. Buggs,* 219 Kan. 203, 216, 547 P.2d 720 (1976). In *Buggs,* we discussed the difference between a taking to facilitate the commission of a crime and a taking which is merely incidental to the main crime. We held:

"[I]f a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:

"(a) Must not be slight, inconsequential and merely incidental to the other crime;

"(b) Must not be of the kind inherent in the nature of the other crime; and

"(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." p. 216.

Applying the factors set out in *Buggs,* we find the conduct of the appellant here constituted an independent crime of aggravated kidnapping. The action of the appellant in attempting to force the victim into the trunk was clearly done to facilitate the commission of a crime. Had he succeeded in forcing the victim into the trunk, the appellant would have substantially lessened the risk of detection. In addition, his actions in shoving her out of the barn and trying to push her into the trunk were not of the kind inherent in the nature of attempted first-degree murder. Thus, the evidence presented was sufficient to establish the separate crime of aggravated kidnapping.

As a final point under this issue, the appellant argues the trial court erred in failing to instruct upon the offense of attempted kidnapping.

"Attempt" is defined at K.S.A. 1984 Supp. 21-3301(a) as follows:

"An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime."

As we previously stated, the evidence presented at trial was sufficient to establish the completed crime of aggravated kidnapping. Therefore, the trial court's failure to give an instruction on attempted kidnapping was not error.

Appellant next argues the trial court erred in not finding him to be insane as a matter of law under the *M'Naghten* test of insanity.

Much of the trial of this case was taken up with the testimony of psychological experts relating to the appellant's mental condition. Dr. Moeller, a clinical psychologist, was initially contacted by the State to evaluate the defendant, but after the State declined to call him as a witness, he testified for the defense. Dr. Moeller testified that the appellant was a "very impaired individual." He described the appellant as having a borderline personality, a condition under which a person with enough emotion and stress "can become disoriented to the place where

he . . . does not know right from wrong, reality from fantasy." Dr. Moeller also testified he did not believe the appellant knew right from wrong at the time of the attack.

Dr. Thomas Thorp, also a clinical psychologist, testified that the appellant suffered from a personality disorder, was very prone to anxiety and sensitive to stress, and that it was not unusual for persons with the appellant's psychological problems "to lose awareness of their actions for certain periods of time." Dr. Thorp did not believe the appellant knew right from wrong at the moment of the crime.

Dr. Leslie Ruthven, a clinical psychologist, also testified at trial regarding the results of tests he performed on the appellant. Dr. Ruthven testified the appellant exhibited some symptoms of temporal lobe epilepsy, but his testing was unable to negate or confirm the existence of that defect. Dr. Ruthven concluded from his testing the appellant suffered from brain damage which had been in existence for a very long time, and that this brain damage prevented the full development of his intellectual academic skills and higher level ability. Dr. Ruthven did not testify as to whether the defendant knew right from wrong at the time of the crime.

Since the only experts who testified regarding the issue of legal insanity were both of the opinion that the appellant was legally insane at the time of the incident, appellant argues the trial court should have found him insane as a matter of law.

The test for taking the issue of insanity away from the jury was adopted by this court in *State v. Chase*, 206 Kan. 352, 362, 480 P.2d 62 (1971), and reiterated in *State v. Sanders*, 225 Kan. 147, 151, 587 P.2d 893 (1978). There, we held that in order to remove the case from the jury's consideration on the basis of the evidence, reasonable persons must necessarily possess a reasonable doubt as to the defendant's sanity and must conclude that the government has failed to sustain its burden of proving beyond a reasonable doubt that the accused had the capacity to commit the crime.

In *Sanders*, we held that even though medical experts are unanimous in their diagnosis of the defendant, such testimony is not conclusive simply because it is not disputed by other medical testimony. *State v. Sanders*, 225 Kan. at 153. In addition to expert testimony, the jury is free to consider the testimony of

non-expert witnesses who observed the accused's actions before, during and after the crime. *State v. Sanders,* 225 Kan. at 153; *State v. Sagebiel,* 206 Kan. 482, 489, 480 P.2d 44 (1971). Additionally, in *In re Jones,* 228 Kan. 90, 99, 612 P.2d 1211 (1980), we noted that evidence a defendant attempted to conceal the crime or his identity as the perpetrator thereof goes a long way to defeat an insanity defense.

In the present case, the appellant was aware no one was at Sunflower Farms the day of the attack except the victim. He attempted to conceal his crime by trying to force the victim into the trunk of his car. Additionally, there was evidence the appellant tried to run over the victim as he fled from the scene of the crime.

We have held it is a rare occasion when the insanity issue should be taken from the jury. *State v. Sanders,* 225 Kan. 147, 151. This is not such a case. The State sustained its burden of proof with respect to the issue of the appellant's sanity and the question was properly sent to the jury.

The appellant's final contention on appeal is that the trial court erred in giving a modified version of the "presumption of intent" instruction, PIK Crim. 2d 54.01. The instruction in question read as follows:

"Ordinarily a person intends all the usual consequences of his voluntary acts. This inference may be considered by you along with all the other evidence in the case. You may accept or reject it in determining whether the State has met the burden to prove the required criminal intent of the defendant.

"If you find that Mr. Jackson was in the throes of an epileptic seizure at the precise time of the commission of the crimes and that the seizure rendered his actions unintentional and involuntary, you must find him not guilty of all charges and their lesser included offenses."

The first paragraph of the instruction is a modified version of PIK Crim. 2d 54.01. That instruction provides:

"Ordinarily a person intends all of the usual consequences of his voluntary acts. This inference may be considered by you along with all the other evidence in the case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant. This burden never shifts to the defendant."

The obvious difference between the instruction given and the PIK instruction, and the difference about which the appellant complains, is the failure of the trial court to instruct the jury that

the burden never shifts to the defendant, as is stated in the last sentence of the PIK instruction.

The second paragraph of the instruction was added as a result of testimony that the appellant may suffer from temporal lobe epilepsy.

In *State v. Robinson, Lloyd & Clark,* 229 Kan. 301, 624 P.2d 964 (1981), we discussed the history of PIK Crim. 2d 54.01 and its predecessor. We noted that the revised presumption met the requirements of *Sandstrom v. Montana,* 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450 (1979). In *Sandstrom,* the court held that the instruction, "the law presumes that a person intends the ordinary consequences of his voluntary acts," violated the requirement that the State prove every element of a crime beyond a reasonable doubt. The court reasoned that this instruction might be interpreted by the jury as creating either a conclusive presumption or a burden-shifting presumption. 442 U.S. at 524.

Thus, in *State v. Robinson, Lloyd & Clark,* we held that the revised instruction (PIK Crim. 2d 54.01) clearly establishes only a permissive inference and does not create a burden-shifting presumption in violation of *Sandstrom.*

We reiterated the *Sandstrom* requirements in *State v. Johnson,* 233 Kan. 981, 666 P.2d 706 (1983), holding that:

"It has long been recognized that any instruction which shifts the burden of proof or of persuasion to the defendant is unconstitutional and is clearly erroneous. It appears that under *Sandstrom* any instruction which might reasonably be construed by the jury as shifting the burden of proof to the defendant is also unconstitutional." p. 985.

We further held in *Johnson:*

"[U]nder the pronouncements of *Sandstrom* and *Johnson,* the jury must be clearly instructed as to the nature and extent of the presumption and that it does not shift the burden of proof to the defendant. Any instruction which may reasonably lead the jury to believe that a presumption is conclusive or that the burden to disprove an element of the crime rests with the defendant is unconstitutional." 233 Kan. at 986.

While the instruction at issue in the instant case adequately conveyed the nature and extent of the presumption, it did not specifically instruct the jury that the burden of proof never shifts to the defendant.

The State concedes it would have been advisable to include the language in question, but argues any error in its omission is harmless. We agree. The jury instruction given here emphasized the State's burden to prove the required criminal intent. The

instruction did not establish a conclusive presumption requiring the defendant to come forth with evidence of his mental state. Rather, it simply stated a permissive inference.

The judgment of the trial court is affirmed.

MILLER, J., concurring: In *State v. Grauerholz*, 232 Kan. 221, 229, 654 P.2d 395 (1982), the defendant contended that the trial court should have given a special jury instruction on diminished capacity. We noted in our opinion that evidence of one's mental state is admissible on the subject of intent, and that the defendant was permitted to introduce all of the evidence he wished, in order to show his mental capabilities. We concluded that a special instruction on diminished capacity need not be given and was properly rejected by the trial court.

In the case now before us, appellant argues that the jury should have been instructed on diminished capacity. We have concluded that the trial court did not err in refusing to give such an instruction. In this I agree. However, the majority has taken a new tack and states: "Whether the jury should be instructed on diminished capacity is left to the sound discretion of the trial court."

The doctrine of diminished capacity is discussed in 21 Am. Jur. 2d, Criminal Law § 41. Under the doctrine:

"[W]here there is evidence of an abnormal mental condition tending to prove either that the accused could not or did not entertain the specific intent or state of mind essential to the offense, such evidence, though not sufficient in itself to establish legal insanity, should be considered for the purpose of determining whether the crime charged, or a lesser degree thereof, was in fact committed."

Evidence of the accused's mental condition may tend to show that he could not form the required intent. Evidence of his physical condition may tend to show that he was unable to perform certain acts charged. Evidence of his presence in some other location during the time that the crime was committed may tend to show that the defendant could not have been present at the crime scene. Each of these are evidentiary matters which a jury may properly consider; but, in my judgment, none of them should be the subject of specific jury instructions.

Jury instructions in a criminal case tell the jury what the State must prove and then tell the jury that it must consider and weigh all of the evidence to determine whether or not the State has met its burden. An instruction on diminished capacity, it seems to

me, would unduly emphasize certain evidence in the case. It is not the function of jury instructions to emphasize either party's evidence or to argue the case on behalf of either side. A special jury instruction on diminished capacity should not be given. I agree with the disposition of this case, but I disagree with the quoted language relating to jury instructions.

McFARLAND, J., joins the above concurring opinion.