No. 65,525

State of Kansas, *Appellee*, v. Earl E. Wilburn, *Appellant.*

(822 P.2d 609)

Opinion filed December 6, 1991.

*J. David Farris,* of J. David Farris Law Offices, of Atchison, argued the cause and was on the brief for appellant.

*Gunnar A. Sundby,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: Earl E. Wilburn appeals his jury trial convictions of first-degree murder (K.S.A. 21-3401) and second-degree murder (K.S.A. 21-3402).

The two claims of error are the trial court's failure to instruct the jury on:

1. diminished capacity not amounting to insanity; and
2. involuntary manslaughter.

By virtue of the issues raised, the facts must be set forth in considerable detail.

Defendant and Cathy Wilburn had a lengthy and troubled marriage. Cathy had filed for divorce five times. A divorce was granted on the fifth petition. There was evidence that defendant had threatened to kill Cathy and her lover, Lyle Crowley, while the divorce was pending. Earl was under a restraining order not to bother Cathy. Earl had residential custody of the two children born to the marriage, Mindie (age 11) and Michael (age 7).

On August 23, 1989, defendant drove his pickup truck to Cathy's residence in Atchison. The two children accompanied him. Cathy was not at home and defendant drove to the residence of mutual friends, Ron and JoAnn Lawless. Several adults were present in the front yard where a whiffle ball game was in progress. Lyle Crowley was playing in the game while Cathy watched from the patio. Defendant let the children out and they went over to visit their mother. Defendant remained in the truck and drove it a short distance away. Later, he returned and pulled up in front of the Lawless residence, and the children returned to the truck. The three drove away, but turned around and returned. Earl again parked in front of the residence. Defendant got out of the vehicle and motioned for Cathy to come over, but she refused.

Earl reached into the vehicle, pulled out a shotgun, and shot Lyle Crowley, who was near the truck. Cathy started running to the victim and the defendant shot her. Defendant then shot the fallen Lyle in the back, turned, and shot Cathy. He got back in the truck with the children and drove to his sister's house. He then drove to his own home, surrendering to the police after a 4½ hour siege situation. Both victims died as a result of their wounds.

Defendant's version of events is as follows. Earlier in the day in question, he had followed Cathy and had caught up with her on the River Road. Defendant removed the vehicle tags from Cathy's automobile. There was an argument about the children. While defendant and Cathy were stopped on the River Road, Lyle Crowley drove up and stopped. Defendant stated Lyle told him he was going to sexually molest defendant's daughter Mindie.

Defendant testified that while he was stopped in front of the Lawless residence the last time, the whiffle ball struck his vehicle and Lyle had come to retrieve the ball. While there, Lyle had repeated his earlier threat relative to Mindie. Defendant testified he "snapped" and had no recall of the shootings.

There was also evidence that no conversation occurred at the truck between defendant and Lyle except for defendant saying, "Good-by Lyle" just before the shooting. Additionally, there was evidence defendant took the cover off of the shotgun while the children were in the Lawless yard talking with their mother.

Defendant was charged with two counts of first-degree murder. He filed a notice of intent to rely on an insanity defense, which defense was abandoned at trial. He was convicted of first-degree murder relative to the slaying of Lyle Crowley and of second-degree murder (a lesser included offense instruction) for the slaying of Cathy. The trial court had also instructed on voluntary manslaughter as a lesser included offense in the two counts. Other facts will be set forth as necessary for the discussion of particular points.

## DIMINISHED CAPACITY

Defendant requested that an instruction be given on diminished capacity. The trial court denied the request on the basis that the same was unnecessary as the defendant had abandoned his insanity defense.

In a criminal action, a trial court must instruct the jury on the law applicable to the theories of all parties where there is supporting evidence. When considering the refusal of a trial court to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction. *State v. Hunter*, 241 Kan. 629, Syl. ¶¶ 8, 9, 740 P.2d 559 (1987).

In support of his argument herein, defendant relies on testimony of his sister that shortly after the dual slayings, defendant was wild, his eyes were fiery, and he looked out of control. Defendant's father and uncle (who had contact with defendant while police were trying to get him to surrender) testified defendant did not act stable. A psychologist, who was a neighbor of defendant, testified the shotgun slayings were out of character for the defendant. Additionally, defendant relies on the testimony of two staff members of the State Security Hospital at Larned. They are Dr. J. Lalith Fernando, a psychiatrist, and Thomas Runge, a psychologist. Defendant characterizes their testimony as being to the effect defendant did not intend or plan to kill the victims. This characterization is broader than their actual testimony. Defendant had been sent to the Larned facility for an evaluation relative to his intended insanity defense. The result of the evaluation was that defendant was not legally insane under the *M'Naghten* rule.

After testifying to the evaluation team's finding that defendant was not legally insane, Dr. Fernando was asked about the fact defendant had steadfastly maintained he had no recall of the actual killings. Dr. Fernando testified he was of the opinion defendant was not faking his lack of recall—he truly did not remember. The following questions and answers then occurred:

"Q. [Defense counsel] And, Doctor, it is also your opinion that—and we have talked about this—that when you say the loss of control to such an incident that he did something he never intended to do, that being the shooting, that is your opinion too, is it not, Doctor?

"A. Yes, I need to explain that a little further. I am not saying that he never intended to do that. I am assuming that, you know, that was an explanation to try and find out why he lost that memory. That is the explanation that I am giving, that as I said, that a possibility that I saw him that I saw many things that could have happened. One of the things is that is something he never wanted to do, but he did it, and he just wants to

cut it away from his mind. So he's denying it himself. So you lose the memory, that's one of the aspects of this amnesic phases."

Dr. Fernando then discussed defendant's emotional distress over the breakup of his marriage and concluded he finally "snapped." On cross-examination by the State, the following questions and answers occurred:

"Q. [The State] . . . . And as I understand your testimony, there is a possibility, and it does happen from time to time, that people fake memory loss?

"A. Yes, they do.

"Q. Doctor, one of the things that just confuses me just a little bit or puzzles me a little bit [is] you are saying that one of the possibilities for the memory loss is that he did something—that he did something he never really meant to do, is that correct?

"A. Yes.

"Q. That is a possibility?

"A. Yeah.

"Q. But even though that may be a possibility, that he did something he didn't mean to do, you are talking in terms of general senses, that he really loved his wife, why would he kill her?

"A. That is correct.

"Q. It has nothing to do with Mr. Crowley, does it?

"A. I shouldn't think so.

"Q. And if he loved his wife and she [now has a] boyfriend, he would have every reason to want to kill her under the same theory?

"A. I don't know that I'm in a position to comment on that, but I was just trying to find a cause of what to explain. My sole role was clinical, trying to find out why this man has memory loss, so that's why all this explanation there. So I am not in a position to explain as to what happened or what he had in his mind about his wife. I was just taking the facts into consideration. That's all.

"Q. It is, though, your thoughts, or your conjectures, to try and explain this memory loss, correct?

"A. These things that were taken from the books, really and tried to explain that, yeah.

"Q. But the bottom line that really concerns this jury is the fact that he was not suffering from some mental disorder?

"A. No.

"Q. And that he understood the difference between right and wrong?

"A. Yes.

"Q. And, therefore, he is not insane?

"A. No.

"Q. And he is criminally responsible for the acts that he did on August 23, 1989?

"A. Yes, that's what the M'Naghten is all about."

Dr. Fernando was called to testify about whether or not defendant's memory loss was genuine. He concluded that it was and speculated about the causes thereof. This led to further speculation as to why defendant killed the two victims. But it appears quite clear the doctor was not expressing an opinion that defendant was suffering from a mental disorder or lacked criminal responsibility for his acts.

Mr. Runge's testimony is along similar lines. The defendant truly did not remember killing the victims and was not faking his amnesia. Mr. Runge is then, also, drawn into speculation about why defendant killed the people and concludes he was under emotional pressure and snapped. The following questions and answers occurred:

"Q. [Defense counsel] And this would have been generally he was dependent upon Cathy and he was dependent upon his children, is that what you're saying?

"A. Yes, that's quite evident in looking over his history of the times they divorced or planned on getting divorced back together, together again, it's pretty evident it was a life long pattern of function, was indicative of dependency.

"Q. And is the opinion of the staff and is it your opinion that nothing is certain, to him, but in your opinion that on the day in question, Earl lost his?

"A. Yes, I would say it was.

"Q. And instantaneous loss as a result of a build up of all these pressures?

"A. Yeah, there's no evidence to indicate that we had available to us to indicate that he had planned all this. What was evident to us the thing just happened.

"Q. Just happened, just a build up and all of a sudden?

"A. Yes.

"Q. Bang, bang, bang, bang?

"A. Yes, sir."

On cross-examination, the following questions and answers occurred:

"Q. [The State] If you were made aware that his daughter gave a statement that said that when she returned to the vehicle after a visit with [her] mother and found that the gun had now been taken from underneath the seat and now was laying on the seat, in [an] uncased position, would that indicate to you maybe there was a little bit more planned about this?

"A. I couldn't really judge on that on face value, I don't think. It depends on when he had enough. You know, in my opinion, you know, it was something that occurred [due to] a lot of stress and things he just couldn't

cope with. The fact that he took a gun out of a case, set it in the truck, you know, that would, you know, no doubt raise an issue that maybe it was more thought of than that, but there's no way to tell that without actually having [been] there and witnessed it.

. . . .

"Q. Now, I guess when we get down to the bottom line is you've indicated that perhaps he snapped or lost his as being a possible explanation for his memory loss and for what he did, is that correct?
"A. Yes.
"Q. But that's not a legal defense, is it?
"A. Not that I'm aware of, no.
"Q. Not in Kansas?
"A. No.
"Q. It boils down to this, it's still under your opinion and the opinion of the psychiatric staff is that he's not suffering from some mental disorder such that he could not distinguish right from wrong?
"A. No, sir, he is not.
"Q. And therefore, he had culpability, and he should be responsible for the actions that he did on August 23, 1989?
"A. Yes, sir.
"Q. In a legal sense?
"A. Yes, sir.
"Q. In a mental illness sense?
"A. Yes, sir."

In *State v. Grauerholz*, 232 Kan. 221, 229, 654 P.2d 395 (1982), we rejected a claim that the jury should have been instructed on diminished capacity, saying:

"We should point out that evidence of one's mental state is admissible on the subject of intent, and the defendant was permitted to introduce all of the evidence he wished, in order to show his mental capabilities throughout the period involved herein. The ultimate issue, however, is that posed by the *M'Naghten* test, and the jury was properly and fully instructed in that regard. By its verdict, the jury found that the defendant knew that it was wrong when he diverted funds from the Wark and Patterson estate accounts into his own; in short, the jury rejected the proffered insanity defense.

"As indicated earlier in this opinion, a guardian and conservator was appointed for the defendant in 1981. The guardian-conservator was granted leave to file a brief, and did so. He points to the following language from Syl. ¶ 2 of our opinion in *State v. Dargatz*, 228 Kan. 322, which reads: 'Although a mental illness or defect not amounting to legal insanity is not a defense, since, for purposes of the capacity to commit crime, degrees of mental abnormality are not recognized, where the crime charged requires a specific intent, evidence of a mental defect which negates the specific intent is admissible.'

He then argues that the jury should have been given a special instruction on diminished capacity. Not so. In the *Dargatz* opinion, at page 332, we said: 'The doctrine of diminished mental capacity, while never specifically rejected by this court, is inconsistent with the law of this state *and we decline to adopt it.*' (Emphasis added.) As we said in the *Dargatz* syllabus, *evidence* of mental defects is admissible; but the instruction now proposed by the guardian-conservator is not the law of this state and should have been rejected if it had been proposed at trial."

In *State v. Jackson*, 238 Kan. 793, 798, 714 P.2d 1368, *cert. denied* 479 U.S. 821 (1986), this court reviewed the law concerning diminished capacity and concluded that such an instruction may be given:

"Evidence of diminished capacity is admissible only for the limited purpose of negating specific intent and is not a substitute for a plea of insanity. Where insanity is relied upon, the jury must first determine that issue. If it finds the defendant sane, it may then consider, where appropriate, evidence of diminished capacity as a defense to a crime requiring proof of a specific intent. Whether the jury should be instructed on diminished capacity is left to the sound discretion of the trial court."

In *State v. Maas*, 242 Kan. 44, 51-53, 744 P.2d 1222 (1987), we said:

"The second issue raised on the appeal is that the trial court erred in failing to give the defendant's requested instruction on diminished capacity. The defendant argues that four of the charges against him were specific intent crimes. The medical experts who testified on behalf of both the State and the defense disagreed as to whether the defendant was legally insane, but agreed that the defendant was severely depressed at the time the offenses were committed.

"Although the trial court refused to give an instruction on diminished capacity, it permitted defense counsel to argue to the jury that defendant's diminished capacity precluded the defendant from forming the specific intent required for certain crimes. The jury was fully instructed on the lesser included offenses.

"This court's position on diminished capacity was discussed in depth in *State v. Jackson*, 238 Kan. 793, 714 P.2d 1368 (1986). In *Jackson*, it was held that evidence of diminished capacity is admissible for the limited purpose of negating specific intent, but that the trial court is not required to give an instruction on diminished capacity. In the present case, the district court gave the insanity defense instruction, but rejected the defendant's request for a diminished capacity instruction. It instructed the jury on all of the lesser included offenses involved in the specific intent crimes. We have concluded that the district court did not commit error in refusing to provide the jury with a diminished capacity instruction. Such a holding is entirely consistent with the rulings of this court in *State v. Jackson* and the

other cases cited therein. However, a majority of the court is of the opinion that it would be better practice for the trial court to give an instruction on diminished capacity where such an instruction is reasonably necessary to inform the jury of the effect of a defendant's diminished capacity on the specific intent required for the crime charged. Until the Pattern Instruction Committee of the Judicial Council has provided such an instruction, an instruction in the following form would be appropriate: 'Diminished mental capacity of the defendant not amounting to insanity is not a complete defense to a criminal charge, but when a particular intent or other state of mind is a necessary element of the offense charged, diminished mental capacity may be taken into consideration in determining whether the accused was capable of forming the necessary specific intent or state of mind.' "

In summary, the criminal law concept of diminished capacity requires the presence of a mental disease or defect not amounting to legal insanity which a jury may consider in determining whether the defendant has the specific intent required for the crime charged. Mere personality characteristics such as poor impulse control, a short temper, frustration, feelings of dependency, "snapping," lack of concern for the rights of other people, etc., do not constitute a mental disease or defect bringing the doctrine of diminished capacity into play.

Under the facts before us, evidence of diminished capacity was lacking. Evidence that defendant became frustrated over his marital problems, lost control, snapped, etc., go to personality characteristics and reactions to events rather than any underlying mental disease or defect. Even had evidence of diminished capacity been presented, the giving of an instruction thereon is not required and is a matter of trial court discretion.

The trial court stated it would not give a diminished capacity instruction because the insanity defense had been abandoned. Although generally an insanity defense is likely to be present in a case where diminished capacity is asserted, there is no requirement therefor. The complete defense of insanity does not have to be asserted in order to claim diminished capacity. The judgment of a trial court, if correct, is to be upheld even though the court may have relied upon a wrong ground or assigned an erroneous reason for its decision. *Sutter Bros. Constr. Co. v. City of Leavenworth*, 238 Kan. 85, Syl. ¶ 4, 708 P.2d 190 (1985). See *Dearborn Animal Clinic, P.A. v. Wilson*, 248 Kan. 257, Syl. ¶ 6, 806 P.2d 997 (1991).

We find no error or abuse of discretion in the trial court's failure to instruct the jury on diminished capacity.

## INVOLUNTARY MANSLAUGHTER

K.S.A. 21-3107(3) provides:

"In cases where the crime charged may include some lesser crime, it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced. If the defendant objects to the giving of the instructions, the defendant shall be considered to have waived objection to any error in the failure to give them, and the failure shall not be a basis for reversal of the case on appeal."

In *State v. Dixon*, 248 Kan. 776, Syl. ¶¶ 1, 2, 811 P.2d 1153 (1991), we held:

"A trial court has the affirmative duty to instruct the jury on all lesser included offenses established by the evidence. Instructions on lesser included offenses must be given even though the evidence is weak and inconclusive and consists solely of the testimony of the defendant. An instruction on a lesser included offense is not required, however, if the evidence at trial excludes a theory of guilt on the lesser offense. The duty of the trial court to instruct on the lesser included offense is applicable only when the evidence introduced at the trial is such that the defendant might reasonably have been convicted of the lesser offense."

"When the trial court refuses to give an instruction on a lesser included offense, the appellate court must view the evidence supporting the lesser charge in the light most favorable to the party requesting the instruction."

The defendant argues it was error for the trial court to fail to instruct the jury on involuntary manslaughter as a lesser included offense of first-degree murder. The crime of involuntary manslaughter is set forth in K.S.A. 21-3404 as follows:

"(a) Involuntary manslaughter is the unlawful killing of a human being, without malice, which is done unintentionally in the wanton commission of an unlawful act not amounting to felony, or in the commission of a lawful act in an unlawful or wanton manner.

"(b) As used in this section, an 'unlawful act' is any act which is prohibited by a statute of the United States or the state of Kansas or an ordinance of any city within the state, which statute or ordinance is enacted for the protection of human life or safety."

It is uncontroverted defendant was in close proximity to his victims when all four shots were fired. There is no claim the

shotgun discharged accidentally on any of the four occassions. In order to support involuntary manslaughter, the killing must be done unintentionally in the wanton commission of an unlawful act not amounting to a felony, or in the commission of a lawful act in an unlawful or wanton manner. Defendant does not even suggest in his brief what unlawful act (not amounting to a felony) or what wanton lawful act the jury could have found he was committing when he was shooting each victim twice. Involuntary manslaughter simply does not fit any evidence in this case or any logical inferences arising therefrom. We find no error in the trial court's failure to instruct the jury on involuntary manslaughter.

The judgment is affirmed.