No. 66,995

STATE OF KANSAS, *Appellee,* v. KENNETH L. FRIBERG, *Appellant.*

(843 P.2d 218)

Opinion filed December 11, 1992.

*Rick Kittel,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, and *Delia York,* legal intern, were with him on the brief for appellant.

*W. Scott Toth,* assistant district attorney, argued the cause, and *Paul J. Morrison,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Kenneth L. Friberg, from his convictions of aggravated assault on a law enforcement officer and aggravated battery against a law enforce-

ment officer, contrary to K.S.A. 21-3411 and K.S.A. 21-3415. The defendant received a controlling sentence of 20 years to life.

He claims error in the trial court's refusal to instruct on diminished capacity and in evidentiary rulings.

The defendant, his girlfriend, and their baby were on their way from Missouri to Montana when they became lost in Overland Park, Kansas. The defendant was driving. His girlfriend was in the front passenger seat and the baby was in the back seat. It was approximately 2:30 a.m.

Overland Park Police Officer David Moore noticed the defendant's vehicle being driven on Metcalf Avenue with a headlight and a taillight out and with no license plate light. Moore followed the vehicle, which subsequently turned east on 83rd Street. The defendant was driving below the speed limit, sometimes as slow as 10 miles an hour. The defendant pulled into a bus lane in front of the old Broadmoor Junior High School without signaling, slowed down even further, and then pulled back onto 83rd Street without signaling.

After the defendant turned left on Lamar, Moore, using the public address system, instructed the defendant to pull over. The officer also turned on his siren and flashing lights.

Before exiting his patrol car, Officer Moore turned on the spotlight and aimed it at the back of the driver's head. Moore then walked over to the driver's side of the vehicle. When he looked inside the vehicle, he saw the driver holding a rifle across his chest. Moore made eye contact with the driver, whom Moore identified as the defendant, Kenneth L. Friberg. Friberg then shot the officer in the jaw. After being shot, he stepped backwards, lost his balance, and fell. Friberg drove off, and Moore radioed for assistance.

Officer Tony Maddex responded. In the 7500 block of Lamar, Maddex saw a vehicle matching the description of the vehicle driven by Friberg and activated his flashing lights and siren. Friberg turned into a cul-de-sac south of 75th Street and turned off the car's lights. Friberg went to the left, Maddex to the right, and the two vehicles, both moving slowly, ended up facing each other. The officer turned his spotlight on the vehicle and subsequently identified the driver as Kenneth L. Friberg. About the time Maddex noticed that Friberg had a rifle pointed out the

window, the defendant accelerated toward the officer. Maddex laid across the front seat of his car as Friberg drove past, but the rifle was not fired. This incident is the basis of the aggravated assault on a law enforcement officer. The officer resumed his pursuit; however, he eventually lost sight of the defendant's vehicle.

A few hours later, the police located the vehicle backed into a parking place at a condominium complex in Mission, Kansas. Three rifles were found inside the vehicle. The police also eventually located and arrested Friberg.

En route to and after arriving at the police station, Friberg told police officers that he grabbed a rifle, stuck it out his window, and twice fired in the general direction of the officer. He also said he was epileptic, subject to seizures, and on medication, specifically Dilantin and Phenobarbital, which he had not taken for two or three days. The defendant subsequently complained of feeling dizzy. Med-Act was called, and Friberg was treated. Friberg later told the police that his passenger, not he, had shot the officer. The next day, Friberg told police that he had shot the officer and that he had shifted the blame to the passenger because he was scared.

## 1. Diminished Capacity

With regard to aggravated battery against a law enforcement officer, Friberg argues the trial court erroneously refused to instruct the jury on diminished capacity. "[E]vidence of diminished capacity is admissible for the limited purpose of negating specific intent." *State v. Maas*, 242 Kan. 44, 52, 744 P.2d 1222 (1987). Aggravated battery against a law enforcement officer is a specific intent crime. *State v. Ferris*, 222 Kan. 515, 517, 565 P.2d 275 (1977).

The defendant requested the instruction on diminished capacity that was approved in *State v. Maas*, 242 Kan. at 52-53.

The trial judge refused to give the requested instruction on diminished capacity, stating:

"I listened in vain for testimony that would tie the defendant's conduct factually with the concept and causal factor of diminished mental capacity. It is the Court's opinion it simply was not there and that the doctors would not commit themselves to that concept or that causal relationship that the

Court views as a condition precedent to that instruction being employed or given."

Friberg contends there was sufficient expert testimony concerning his organic brain dysfunction to support such an instruction. Three experts testified. Leif Leaf, Ph.D., a psychologist specializing in neuropsychology, and Dorsey Dysart, a medical doctor specializing in neurology and psychiatry, testified for the defense. The State called Gerald Vandenberg, Ph.D., a clinical and forensic psychologist, as a rebuttal witness.

Dr. Leaf described the defendant as having "a reduced or lowered intellectual functioning and capacity" consistent with an organic brain dysfunction. This dysfunction commonly results in antisocial behavior and affects control, judgment, and impulsivity. Specifically, the doctor testified that Friberg had problems with his memory, with problem solving, and with evaluating new situations; that Friberg had limited insight; and that Friberg suffered from antisocial personality disorder, or a conscience deficit. Dr. Leaf acknowledged that Friberg's problem was not that he did not know what was going on around him; the problem was his inability to control his actions.

Dr. Dysart determined Friberg had an organic personality disorder, a frontal lobe dysfunction, and a borderline antisocial personality. The doctor concluded the defendant had brain damage. Dr. Dysart said that because of frustration and anxiety, Friberg could have lost some of his capacity to reason and, therefore, resorted to violence. According to the doctor, Friberg was not psychotic, experiencing unreality, or suffering from a mental disease or defect that made him unable to appreciate the wrongfulness of his act; however, the defendant's "appreciation of reality could have been diminished if he was overstimulated by all the stress that he was under." The following exchange took place during the cross-examination of Dr. Dysart:

"Q. [Y]ou are not trying to tell this jury that those things affected him shooting that policeman that night; correct?
A. I am saying they are eligible. They could have.
Q. You are not telling us that they did though; right?
A. No.
Q. Because you don't know?
A. Right.

Q. As a matter of fact, Doctor, you said in your report that, and I'm going to quote here, 'It is the opinion of this examiner that Mr. Friberg does not suffer from a severe mental disease or defect that would make him unable to appreciate the nature and quality of the wrongfulness of the act in question.' Is that correct?
A. Correct.
Q. In other words, when the policeman was walking up to him, you are saying that he's going to recognize that person as a policeman?
A. Absolutely.
Q. He is going to recognize this as a firearm; correct?
A. Correct.
Q. And if he points that gun and pulls that trigger, he's going to know that for what it is; correct?
A. Should.
Q. What you are saying is that these problems if, in fact, they came into play, affected his reasoning?
A. They could have.
Q. In other words, his ability to make the right decision; right?
A. Correct.
Q. Which the prisons are full, as we both know, of people that can't do that; right?
A. Right."

Dr. Vandenberg disagreed with Dr. Dysart's findings. Dr. Vandenberg testified that Friberg was not brain damaged, but did have some brain dysfunction, which the doctor explained as involving lags in information processing. Dr. Vandenberg stated that such dysfunction does not affect an individual's ability to make a decision or to comprehend what is happening around him or her. The doctor concluded that Friberg's behavior could be attributed to antisocial personality disorder.

According to the defendant, the standard of review is whether there was evidence, even if slight, to support the giving of an instruction. That is an overbroad statement; however, the standard with regard to diminished capacity is different in any event. A "trial court is not required to give an instruction on diminished capacity." *State v. Wilburn*, 249 Kan. 678, Syl. ¶ 4, 822 P.2d 609 (1991). Whether to instruct the jury on diminished capacity is a matter of trial court discretion. See, *e.g.*, *State v. DeMoss*, 244 Kan. 387, 392, 770 P.2d 441 (1989); *Maas*, 242 Kan. at 52; *State v. Jackson*, 238 Kan. 793, 798, 714 P.2d 1368, *cert. denied* 479 U.S. 821 (1986). As recently as 1991, this court declined to

change that standard. *State v. Cady*, 248 Kan. 743, 748-49, 811 P.2d 1130 (1991).

In *Wilburn*, 249 Kan. at 686, the most recent case to address diminished capacity, this court summarized:

"[T]he criminal law concept of diminished capacity requires the presence of a mental disease or defect not amounting to legal insanity which a jury may consider in determining whether the defendant has the specific intent required for the crime charged. Mere personality characteristics such as poor impulse control, a short temper, frustration, feelings of dependency, 'snapping,' lack of concern for the rights of other people, etc., do not constitute a mental disease or defect bringing the doctrine of diminished capacity into play.

"Under the facts before us, evidence of diminished· capacity was lacking. Evidence that defendant became frustrated over his marital problems, lost control, snapped, etc., go to personality characteristics and reactions to events rather than any underlying mental disease or defect. *Even had evidence of diminished capacity been presented, the giving of an instruction thereon is not required and is a matter of trial court discretion.*" (Emphasis added.)

Based upon the expert testimony discussed previously, a reasonable person could agree with the trial court's refusal to instruct the jury on diminished capacity. Thus, the trial court did not abuse its discretion.

Friberg also contends that failure to instruct the jury on diminished capacity denied him the opportunity to present a complete defense, which violated his due process rights. This court addressed and rejected that argument in *State v. Cady*:

"Cady was not deprived of his right to present his claim of diminished capacity to the jury. He presented the testimony of his expert witness and had the opportunity to cross-examine the State's witnesses. The defendant was not restricted in his closing argument to the jury. Cady merely failed to convince the jury of his diminished capacity." 248 Kan. at 749.

The same can be said in the instant case. Friberg presented the testimony of his expert witnesses and cross-examined the State's witness. The defendant was not restricted in his closing argument to the jury, other than by the evidence presented at trial. Friberg's due process rights were not violated.

### 2. Evidence

The defendant's second argument is tied closely to his first argument. Friberg argues that the trial court erred in limiting

his presentation of evidence concerning childhood beatings and other background information because such evidence was foundation for evidence concerning his diagnosed organic brain dysfunction. The defendant claims that the trial court's actions denied him the opportunity to present a complete defense and, as a result, violated his due process rights.

With regard to the admissibility of evidence, this court has established the following principles.

"Admission or exclusion of evidence is within the sound discretion of the trial court, subject to exclusionary rules. [Citations omitted.]

"Relevant evidence is defined as 'evidence having any tendency in reason to prove any material fact.' [Citations omitted.] The determination of relevancy is a matter of logic and experience, not a matter of law. [Citation omitted.] In *State v. Brown*, 217 Kan. 595, 599, 538 P.2d 631 (1975), it was said:

'In discussing relevancy, we have frequently said that to be admissible in the trial of a case evidence must be confined to the issues, but it need not bear directly upon them. To render evidence of collateral facts competent, there must be some natural, necessary or logical connection between them and the inference or result which they are designed to establish. [Citations omitted.]' " *State v. Nemechek*, 223 Kan. 766, 769-70, 576 P.2d 682 (1978).

See *State v. Wagner*, 248 Kan. 240, 243-44, 807 P.2d 139 (1991); *State v. Walker*, 239 Kan. 635, Syl. ¶ 5, 722 P.2d 556 (1986).

Prior to the start of the trial, the State orally moved for a motion in limine, requesting that Friberg make a proffer of evidence relating to the defendant's diminished capacity defense. The trial court ruled that the defendant was not required to provide the State with a summary of his diminished capacity evidence. Additionally, the court ordered the defense to limit testimony of the defendant's expert witnesses to those issues relevant to or bearing upon diminished capacity.

During opening arguments, defense counsel told the jury that as a child, Friberg had been beaten by his father and that those beatings had caused head injuries. The State objected. The trial court cautioned defense counsel that the jury would be instructed to disregard such evidence unless defense experts testified "that these beatings had a direct effect upon organic brain dysfunction or upon the diminished capacity." Prior to the testimony of defense experts, the State requested that the trial court remind

defense counsel of its previous ruling. In response, Friberg maintained family and background evidence was foundation for the experts' testimony. The trial court upheld its previous ruling, stating:

"[R]eference to beatings as a child, to being raised in foster homes, to other issues which are obviously collateral to the issues in this case have no bearing and are inappropriate unless the doctor is going to testify that those things somehow have a causal effect on a diminished capacity."

Dr. Leaf then testified that factors inducing organic brain dysfunction included substance abuse, blows to the head causing edema or subdural hematoma that cause swelling to the head, or seizures or strokes that cause "strains in brain function." When asked if he had determined what brought about the dysfunction in the defendant, Dr. Leaf stated:

"Well, in his self-report he did indicate that he has had several incidents of head injuries and his history and his social—psychosocial history would seem to also support that he's had several incidents of substance abuse as well as head injuries."

In conjunction with his diagnosis of organic personality disorder, Dr. Dysart mentioned that the defendant experienced social problems in childhood.

The State contends that the experts' testimony shows that the allegedly excluded evidence was presented. The defendant seems to argue that he wanted to present more detailed information regarding childhood beatings, foster homes, etc. Sufficient evidence concerning the alleged childhood beatings was presented to allow the jury to consider the impact of such upon his claim of diminished capacity. There is no merit to the defendant's argument that he was not allowed to present a complete defense.

In addition, the trial court did not abuse its discretion in its ruling. The trial court gave Friberg the opportunity to establish a "natural, necessary or logical connection" between the beatings the defendant said he received as a child and his claim of diminished capacity at the time of the shooting. Because Friberg failed to establish that connection with any specificity, a reasonable person could agree with the trial court's evidentiary rulings. Thus, the trial court did not abuse its discretion.

Affirmed.