No. 126,130

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

CHRISTOPHER SHAWN ADAMS,
*Appellee*.

SYLLABUS BY THE COURT

In the circumstances of this case, the district court properly permitted a witness to assert her constitutional privilege against self-incrimination to avoid testifying at the defendant's criminal trial after the State charged her with perjury based on her preliminary hearing testimony. The State's offer of statutory immunity under K.S.A. 22-3415 was insufficient to shield the witness from the real risk she would face an additional perjury charge if she were compelled to testify.

Appeal from Ellis District Court; THOMAS J. DREES, judge. Submitted without oral argument. Opinion filed April 19, 2024. Affirmed.

*Kristafer R. Ailslieger*, deputy solicitor general, and *Kris W. Kobach*, attorney general, for appellant.

*Heather R. Fletcher*, of Johnson Fletcher, LLC, of Hays, for appellee.

Before ARNOLD-BURGER, C.J., ATCHESON, J., and TIMOTHY G. LAHEY, S.J.

ATCHESON, J.: If a prosecutor charges a witness with perjury based on his or her preliminary hearing testimony in a criminal case, may that person then assert a constitutional privilege against self-incrimination when called as a State's witness in the

later jury trial? The Ellis County District Court ruled Stephanie Lang could exercise her right to avoid another perjury charge in that circumstance. We agree. In reaching that conclusion, the district court made two related determinations. First, the district court held that the State's grant of immunity to Lang under K.S.A. 22-3415 was insufficient to protect her against a second perjury charge. Again, we agree. The district court also ruled that the State could not use Lang's preliminary hearing testimony and her out-of-court statements presented during the preliminary hearing as evidence in the jury trial, even though she would be unavailable as a witness. Because the State has not challenged that ruling in bringing this interlocutory appeal, it may be reconsidered in the district court.

FACTUAL AND PROCEDURAL BACKGROUND

Given the issue on appeal, we may quickly sketch the underlying criminal charges against Defendant Christopher Shawn Adams. The procedural developments in the district court more closely frame the legal dispute.

A couple of hours after a Saturday night slipped into Sunday morning in September 2021, a man was punched in the face outside a bar and grill in downtown Hays. The man's jaw and nose were broken in the sudden attack, and he did not know who struck him. Police officers responded quickly, but none of the onlookers could identify the attacker.

The police received a report of a domestic disturbance nearby. When they arrived, they found Lang, Adams, and a third man. The man told police he saw a physical dispute between Lang and Adams, attempted to intervene, and called 911. According to the man, Adams struck him. When questioned by officers there—in a recorded interview—Lang said Adams grabbed her and threw her to the ground. She also said Adams had punched a man outside a bar, knocking him to the ground. Lang said she was a nurse and briefly attended to the man.

2

About a week later, the State filed three charges against Adams: (1) aggravated battery, a severity level 4 person felony, for punching the man near the bar and grill; (2) misdemeanor domestic battery of Lang; and (3) misdemeanor battery of the man who stepped into their altercation. The State called Lang at Adams' preliminary hearing on the aggravated battery charge. In her testimony, Lang said she did not see Adams punch anyone outside the bar and grill. And she testified she did not recall what she had told the police because she was quite intoxicated that night. The State called one of the police officers and played the recorded interview of Lang in which she inculpated Adams. The magistrate judge bound Adams over for trial.

The prosecutor then charged Lang with perjury for testifying falsely at the preliminary hearing and alternatively with interference with law enforcement for making false statements to the investigating police officers. Each charge against Lang was a felony. At the start of Adams' jury trial, Lang appeared with her lawyer and on his advice informed the district court that she asserted her right not to incriminate herself and, therefore, would not testify. The prosecutor tendered a grant of use and derivative immunity to Lang for her trial testimony under K.S.A. 22-3415. By its terms, statutory immunity does not cover perjury "in giving such evidence." K.S.A. 22-3415(d). While explaining "the State's theory" as to why Lang could not assert her privilege against self-incrimination, the prosecutor told the district court he viewed Lang's preliminary hearing testimony as perjurious "and therefore any consistent statements would be perjury again."

Under the circumstances, the district court concluded both that the prosecutor's grant of immunity would not protect Lang from a new perjury charge if her trial testimony mirrored her preliminary hearing testimony and that she faced a substantial threat of being so charged. Accordingly, the district court found Lang had properly invoked her constitutional right against self-incrimination and did not have to testify in Adams' trial, making her an unavailable witness. See K.S.A. 60-459(g)(1). The district court went on to find that the State—having already asserted Lang's preliminary hearing

3

testimony to be false—could not offer that testimony during the trial and, in turn, could not present Lang's out-of-court statements admitted as evidence at the preliminary hearing.

Based on those evidentiary rulings, the prosecutor concluded the case against Adams had been substantially impaired and sought an interlocutory appeal under K.S.A. 22-3603 for that reason.

LEGAL ANALYSIS

*Appellate Jurisdiction*

Although the parties focus on the portion of the district court's ruling allowing Lang to assert her constitutional privilege against self-incrimination, we necessarily consider a gatekeeping requirement for the State's interlocutory appeal. To bring an appeal under K.S.A. 22-3603, the State must show that the district court's exclusion of evidence would "seriously impede" the successful prosecution of the defendant. *State v. Huninghake*, 238 Kan. 155, 157, 708 P.2d 529 (1985). The Kansas Supreme Court has held the statute covers rulings precluding the presentation of previous testimony of an unavailable witness if the effect would "substantially impair" the State's case against the defendant at trial. *State v. Newman*, 235 Kan. 29, 35, 680 P.2d 257 (1984).

Considering the overall impact of the district court's decision, we readily conclude the ruling materially undercut the State's ability to prosecute Adams successfully. Lang's out-of-court statements provided the primary evidence identifying Adams as the perpetrator of the aggravated battery outside the bar and grill. The preclusion of those statements satisfied the standard for an interlocutory appeal outlined in *Huninghake* and *Newman*. We, therefore, have appellate jurisdiction. The State and Adams have filed briefs. Lang has not requested the opportunity to do so, although her constitutional rights

4

are directly at stake. We suppose she could have been heard here through her lawyer, as she was in the district court, if only as an amicus curiae.

*Constitutional Privilege Against Self-Incrimination*

We now turn to the district court's decision permitting Lang to assert her privilege against self-incrimination and explain why the ruling properly serves the constitutional protection given the unusual facts of this case. After addressing that part of the district court's ruling, we offer a closing comment about the scope of the district court's concomitant exclusion of evidence. And I elaborate on that comment in a concurring opinion to suggest the exclusion of Lang's preliminary hearing testimony along with her out-of-court statement to the police may be error.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The protection permits an individual to refuse to answer questions put to them in a police interview, a grand jury proceeding, a judicial hearing or trial, and other governmental inquisitions when a prosecutor could later use the responses to pursue criminal charges against that individual. See *Michigan v. Tucker*, 417 U.S. 433, 440-43, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974); *Kastigar v. United States*, 406 U.S. 441, 444-45, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972). The Framers viewed the right as a shield against Star Chamber prosecutions and the use of confessions induced through physical coercion rendering them inherently unreliable. See *Idaho v. Wright*, 497 U.S. 805, 822-23, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990) (unreliability of statement given under duress); *Tucker*, 417 U.S. at 439-41; *Miranda v. Arizona*, 384 U.S. 436, 444-48, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (Fifth Amendment protection against self-incrimination intended to eliminate physical abuse as means of interrogation). The Fifth Amendment right has been incorporated through the Fourteenth Amendment and, therefore, applies to criminal proceedings in state court. *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d

653 (1964). The Kansas Constitution contains a comparable protection construed coextensively with the Fifth Amendment privilege. Kansas Constitution Bill of Rights § 10; *State v. Boysaw*, 309 Kan. 526, 537-38, 439 P.3d 909 (2019) (self-incrimination protections of United States Constitution and Kansas Constitution "coextensive").

Appellate courts review claims involving the privilege against self-incrimination using the well-known bifurcated standard that accords deference to the district court's factual findings if they are supported by substantial competent evidence but reserves unlimited review of the ultimate legal conclusion based on those findings. *State v. Delacruz*, 307 Kan. 523, 533, 411 P.3d 1207 (2018). More particularly here, the relevant facts are undisputed, so the district court's decision necessarily entails a question of law. *State v. Mejia*, 58 Kan. App. 2d 229, 231-32, 466 P.3d 1217 (2020); *State v. Bennett*, 51 Kan. App. 2d 356, 361, 347 P.3d 229 (2015). Consistent with those standards, we exercise unlimited review over the district court's decision permitting Lang to exercise her Fifth Amendment privilege.

The Fifth Amendment protection against self-incrimination extends not only to statements of witnesses that might directly inculpate them but to those that might furnish an evidentiary link in a prosecutorial chain leading to criminal charges. *Ohio v. Reiner*, 532 U.S. 17, 20, 121 S. Ct. 1252, 149 L. Ed. 2d 158 (2001); *Maness v. Meyers*, 419 U.S. 449, 461, 95 S. Ct. 584, 42 L. Ed. 2d 574 (1975). To trigger the protection, the prospect of criminal prosecution must be realistic rather than merely an academic or hypothetical possibility. Indeed, any witness testifying under oath—even a truthteller—faces an abstract risk of being charged with perjury by a mistaken or overly zealous prosecutor. That sort of metaphysical chance grounded in the witness' abstract and entirely subjective fear is insufficient. *Reiner*, 532 U.S. at 21 ("danger of 'imaginary and unsubstantial character' will not suffice") (quoting *Mason v. United States*, 244 U.S. 362, 366, 37 S. Ct. 621, 61 L. Ed. 1198 [1917]); *In re Grand Jury Subpoena (McDougal)*, 97 F.3d 1090, 1094 (8th Cir. 1996) (recognizing subjective belief of witness that testimony might result

6

in perjury charge insufficient to permit assertion of privilege against self-incrimination). The United States Supreme Court has characterized "the basic test" for invoking the privilege this way: "'[W]hether the claimant is confronted by substantial and "real," and not merely trifling or imaginary, hazards of incrimination.'" *United States v. Apfelbaum*, 445 U.S. 115, 128, 100 S. Ct. 948, 63 L. Ed. 2d 250 (1980) (quoting *Marchetti v. United States*, 390 U.S. 39, 53, 88 S. Ct. 697, 19 L. Ed. 2d 889 [1968]); see also *In re Flint Water Cases*, 53 F.4th 176, 194 (6th Cir. 2022) (recognizing and quoting *Apfelbaum* characterization of when privilege applies); *United States v. Gersky*, 816 Fed. Appx. 772, 778 (4th Cir. 2020) (unpublished opinion); 3 Wharton's Criminal Evidence § 11:8 (15th ed. 2023); 21A Am. Jur. 2d, Criminal Law § 1009.

In short, individuals may invoke the privilege when they have "reasonable cause to apprehend danger" from their statements—the danger being "the peril of prosecution" for one or more crimes. *Hoffman v. United States*, 341 U.S. 479, 486, 488, 71 S. Ct. 814, 95 L. Ed. 1118 (1951). In *Reiner*, the Court cited the apprehension-of-danger language from *Hoffman* as articulating a proper basis for asserting the privilege. 532 U.S. at 21. So the privilege extends to "'any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.'" *Hiibel v. Sixth Judicial Dist. Court of Nevada*, 542 U.S. 177, 190, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004) (quoting *Kastigar*, 406 U.S. at 445); *United States v. Solis*, 915 F.3d 1172, 1177 (8th Cir. 2019) (relying on *Hoffman*, court recognizes privilege shields statements that "reasonably could lead to that individual's own prosecution"); *Convertino v. United States Dept. of Justice*, 795 F.3d 587, 593 (6th Cir. 2015) (citing *Hoffman* and other authority, court finds privilege properly invoked in face of "'a sound basis for a reasonable fear of prosecution'") (quoting *In re Morganroth*, 718 F.2d 161, 169 [6th Cir. 1983]). The reasonable apprehension of criminal prosecution, then, supports a claim of privilege without necessarily considering the prospects for conviction.

We need not endeavor to draw a dividing line between the "real" and the "trifling" in this case. The prosecutor's actions in charging Lang with perjury for her preliminary hearing testimony in tandem with his assertion during the pretrial hearing that she would be committing "perjury again" if she testified in the same manner at trial were more than sufficient to create a substantive and immediate prospect of a new criminal charge. Either standing alone very likely would have been enough. On the eve of Adams' trial, Lang faced about as clear a hazard of being prosecuted anew for her consistent testimony as might be imagined. Lang, therefore, had a Fifth Amendment privilege to avoid placing herself in that position.

When the circumstances depict a tangible basis for prosecution aided by the witness' testimony or other compelled statements, the privilege against self-incrimination should be liberally construed to effect its purpose. *Maness*, 419 U.S. at 461; *Hoffman*, 341 U.S. at 486; *In re Flint Water Cases*, 53 F.4th at 192-93; *United States v. Oriho*, 969 F.3d 917, 924 n.2 (9th Cir. 2020). Accordingly, individuals may assert they have done nothing wrong, i.e. they are innocent, yet invoke the privilege if they, nonetheless, realistically might be prosecuted based on what they would say. *Reiner*, 532 U.S. at 21. Likewise, the privilege may attach to future testimonial acts that would tend to be incriminating and not merely to statements that might implicate the claimant in past criminal conduct, although such situations would be uncommon. *Marchetti*, 390 U.S. at 54 (privilege may extend to "hazards of incrimination created . . . as to future acts" because application not "inflexibly defined by a chronological formula"); see *Apfelbaum*, 445 U.S. at 129 (recognizing *Marchetti* rule but finding it factually inapplicable).

*Offer of Statutory Immunity*

The prosecutor's offer of immunity to Lang under K.S.A. 22-3415 for her trial testimony does not alter the legal calculus, as the district court correctly determined. The offer provided use and derivative immunity. As outlined in the statute, use immunity

8

precludes the government from using the witness' statements against him or her, and derivative immunity bars the use of inculpatory evidence uncovered as a result of the statements. K.S.A. 22-3415(b)(2); see *Delacruz*, 307 Kan. at 534 (describing use, derivative, and transactional immunities). But a grant of statutory immunity cannot shield the recipient from prosecution for perjury based on the statements or other evidence he or she then provides. K.S.A. 22-3415(d).

So, as the district court correctly recognized, the grant of immunity to Lang would not extend to a new perjury charge based on her anticipated testimony in Adams' trial if it were comparable to her preliminary hearing testimony. And, as we have already explained, Lang faced a real and imminent danger that the prosecutor would charge her with perjury—for a second time—should she testify that way. In this quite unusual circumstance, Lang retained her constitutional privilege against self-incrimination notwithstanding the prosecutor's offer of immunity.

The immunity statute carves out perjury to avoid creating a license to testify falsely. That is, witnesses granted immunity in the run of cases are expected to testify truthfully and can be prosecuted for perjury if they do not. For those witnesses the apprehension of prosecution amounts to the sort of abstract or hypothetical concern that does not trigger the privilege against self-incrimination. But the prosecutor's strategy here to charge Lang with perjury for her preliminary hearing testimony created exactly the sort of real danger permitting an individual to invoke the privilege.

Neither the district court nor this panel is in a position to determine the truth or falsity of Lang's preliminary hearing testimony or of her anticipated trial testimony as against the account she gave the police officers. The task belongs to fact-finders—such as jurors—charged with that duty and having had the opportunity to observe Lang as she testifies. As we have explained:

9

"Sorting out testimonial inconsistencies and evaluating credibility is a function uniquely entrusted to jurors. And '[t]he judicial process treats an appearance on the witness stand, with the taking of an oath and the rigor of cross-examination, as perhaps the most discerning crucible for separating honesty and accuracy from mendacity and misstatement.' *State v. Bellinger*, 47 Kan. App. 2d 776, 787, 278 P.3d 975 (2012), *rev. denied* 298 Kan. 1204 (2013) (Atcheson, J., dissenting). The ability of the jurors to observe witnesses as they testify is integral to that evaluation. *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008). Appellate courts have no comparable vantage point when they read a trial transcript, and that is precisely why they do not make credibility determinations." *State v. Franco*, 49 Kan. App. 2d 924, 936-37, 319 P.3d 551 (2014).

In advance of the trial, the district court was in no better a position to make any sort of credibility determination in sorting out Lang's conflicting accounts than we are now.

Consistent with the broad construction accorded the privilege, Lang faced a real danger of being prosecuted for giving what might be truthful testimony and, therefore, could invoke her right against self-incrimination. The magistrate judge's passing comment at the conclusion of the preliminary hearing to the effect he thought Lang's testimony was untruthful doesn't constitute a binding credibility determination. It is no more than oral dicta, since the magistrate judge was legally bound to view the evidence in the best light for the State and, thus, to resolve any discrepancies in the State's favor as a matter of law. See *Cadle Company II, Inc. v. Lewis*, 254 Kan. 158, 167, 864 P.2d 718 (1993) (district court's "gratuitous" comments that corporate officer was not holder in due course "not binding upon further consideration of this case"); *Anne H. v. Michael B.*, 1 Cal. App. 5th 488, 500, 204 Cal. Rptr. 3d 495 (2016) ("[T]here is no reason to require subsequent judges to adhere to an earlier judge's expression of views on issues that were not actually before him or her . . . [because] [s]uch a rule would grant arbitrary and unnecessary authority to judicial musings, as opposed to judicial decisions."); *People v. Wandell*, 143 A. D. 2d 446, 447, 532 N.Y.S.2d 442 (1988); see *State v. Rozell*, 315 Kan. 295, Syl. ¶ 2, 508 P.3d 358 (2022) ("[A] preliminary hearing judge does not pass on

credibility, and, when the evidence conflicts, the judge must accept the version of the testimony most favorable to the State."); *State v. Bell*, 268 Kan. 764, 764-65, 1 P.3d 325 (2000) (same).

As the district court pointed out, a prosecutor typically would handle a recanting witness by calling the witness at trial and then introducing the witness' previous and conflicting statements inculpating the defendant as substantive evidence via the hearsay exception in K.S.A. 60-460(a). In their deliberations, the jurors would fulfill their fact-finding duty to sort out the worthy accounts from the unworthy and credit the worthy ones in reaching a verdict. See *Shannon v. United States*, 512 U.S. 573, 579, 114 S. Ct. 2419, 129 L. Ed. 2d 459 (1994) ("The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged."); *State v. Kemble*, 291 Kan. 109, 120, 238 P.3d 251 (2010) (noting role of jury in trial process as "the finder of facts"); *State v. Bellinger*, 47 Kan. App. 2d 776, 807, 278 P.3d 975 (2012) (Atcheson, J., dissenting) (juries "clean up those messes" involving differing accounts and recollections of events "by weighing evidence, evaluating credibility, and finding facts"). The prosecutor short-circuited the usual process by charging Lang with perjury for her preliminary hearing testimony and, in doing so, animated her constitutional privilege against self-incrimination.

In sum, we find the district court correctly held that Lang could assert her Fifth Amendment privilege against self-incrimination and, therefore, did not have to testify in Adams' trial.

*Evidentiary Repercussions*

Having permitted Lang to assert her Fifth Amendment privilege, the district court found her to be an unavailable witness. See K.S.A. 60-459(g)(1). As we have outlined, in completing its pretrial ruling, the district court nonetheless concluded the State could not

11

offer Lang's preliminary hearing testimony in Adams' trial. The district court reasoned that the State had already taken the position that the testimony was false and, therefore, could not present it to the jury during the trial, although the prosecutor undoubtedly intended to then offer Lang's out-of-court statements inculpating Adams—just as he had done at the preliminary hearing. The district court, in turn, thwarted that plan because without the preliminary hearing testimony, the out-of-court statements amounted to inadmissible hearsay.

The State has not appealed those aspects of the district court's ruling. They are, therefore, not in front of us. And, as a result, they are not binding going forward as law of the case. See *State v. Collier*, 263 Kan. 629, 632-33, 952 P.2d 1326 (1998) (law of the case directs that questions raised and decided on appeal bind parties in further proceedings in that case). They remain interlocutory determinations the district court may revisit.

*Dissent Fails to Account for Key Circumstances of this Case*

In opting for reversing the district court, the dissent offers a reductive assessment of the facts and the law that fails to account for a pair of critical circumstances setting this case apart from the run of cases applying self-incrimination and immunity doctrines: The prosecutor chose to charge Lang with perjury for her preliminary hearing testimony—testimony she presumably would have repeated at trial—and the inability of either the district court or this court to gauge Lang's truthfulness. The State's decision to formally place the heavy hand of a perjury prosecution on Lang in advance of her appearance as a witness at trial upends the governing law, given the demonstrable likelihood she would face an additional perjury charge for testifying as she already had.

We reemphasize that the constitutional privilege against self-incrimination permits an individual to refrain from making statements to government agents that would directly

12

or indirectly support or advance a criminal prosecution of that individual. *Hiibel*, 542 U.S. at 190. So the protection shields against the burdens of facing criminal charges and not just the punitive consequences of a possible conviction. Those burdens include financial and emotional costs, intrusive bond conditions, and for individuals unable to post bail the complete loss of liberty as pretrial detainees. See *Barker v. Wingo*, 407 U.S. 514, 532-33, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972) (In assessing constitutional speedy trial rights, the Court recognized that a criminal prosecution requires the accused to "liv[e] under a cloud of anxiety, suspicion, and often hostility" and often "oppressive pretrial incarceration."). Moreover, even a person who asserts his or her innocence may claim the privilege in the face of a material threat of prosecution. *Reiner*, 532 U.S. at 21.

The dissent's analysis rests on an unwarranted premise that Lang's preliminary hearing testimony was false and a repetition of that testimony at Adams' trial would, of course, also be false. And the dissent, therefore, characterizes the question at hand as "whether Lang can properly invoke the Fifth Amendment to avoid giving false testimony in the future." Slip op. at 33. So without having seen Lang testify, the dissent concludes she lied during the preliminary hearing, and that credibility determination against Lang infuses its rationale and conclusion. But neither we nor the district court (which hadn't observed Lang testify) may properly determine she lied then and, as a substitute, invoke some divination of untruthfulness as a factual foundation to negate her right against self-incrimination.

Armed with its credibility determination against Lang, the dissent examines *Apfelbaum*, 445 U.S. 115, at great length. The exercise ultimately establishes that *Apfelbaum* is factually inapposite. There, Stanley Apfelbaum was suspected of assisting in a theft scheme. The federal prosecutor granted Apfelbaum immunity under a federal statute similar to K.S.A. 22-3415 before he testified in front of a grand jury. The grand jury later indicted Apfelbaum for two counts of perjury for making false statements in his testimony. The question before the United States Supreme Court was how much of

13

Apfelbaum's immunized testimony the government could introduce against him at trial apart from the alleged perjurious statements themselves. The Court held that any otherwise relevant portions of Apfelbaum's grand jury testimony could be admitted at trial because he had faced no more than a "'trifling or imaginary' hazard of self-incrimination" when he was granted immunity in advance of testifying to the grand jury. 445 U.S. at 130-31.

The factual setting of *Apfelbaum* and the resulting legal issue bear little resemblance to Lang's situation. The circumstances would be more nearly analogous if: (1) Apfelbaum had testified in front of the grand jury without immunity; (2) the United States Attorney then charged him with perjury for a material statement he made in that testimony; and (3) the United States Attorney then subpoenaed him to testify in a trial of another defendant and tendered a statutory grant of immunity that didn't cover perjury in his trial testimony. In that scenario—like the one confronting Lang—the threat of an additional perjury charge would be palpably real and would have presented a demonstrably different legal problem for the Court. There is no reason to assume—as the dissent does—that the rationale in *Apfelbaum* should necessarily govern the outcome here without explicitly accounting for those marked differences.

The failure to undertake that accounting fosters a misguided reasoning by analogy where a rule stated in one case is detached from its factual underpinnings and applied in another case with materially different facts. Upon examination, those differences may call for the rule from the initial case to be substantially modified or abandoned altogether as inapposite in the later case. See *Illinois v. Lidster*, 540 U.S. 419, 424, 124 S. Ct. 885, 157 L. Ed. 2d 843 (2004) (Language in judicial opinions should be read "as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering."); *Armour & Co. v. Wantock*, 323 U.S. 126, 132-33, 65 S. Ct. 165, 89 L. Ed. 118 (1944). In *Armour*, Justice Robert Jackson admonished lawyers that "words of our opinions are to

14

be read in the light of the facts of the case under discussion." 323 U.S. at 133. And he cautioned:  "General expressions transposed to other facts are often misleading." 323 U.S. at 133. Professor Cass Sunstein more recently explained that "analogical reasoning can go wrong when . . . some similarities between two cases are deemed decisive with insufficient investigation of relevant differences." Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 757 (1993).

The dissent effectively treats the prosecutor's decision to charge Lang with perjury as if it were of no legal or factual relevance in determining whether she then faced a real threat of an *additional* perjury charge if she were compelled to testify during Adams' trial. As a result, the dissent builds its analysis on the notion that Lang's fear of future prosecution for perjury "is no different from the typical fear facing any other witness." Slip op. at 34. The assertion is blind to reality. The feared consequence—being charged with perjury—may be the same. But the chances of facing the consequence are wholly dissimilar.

As we have explained, the typical witness has only an abstract and entirely hypothetical chance of being charged with perjury. Lang had already been charged, and the prosecutor had voiced his position that if her trial testimony matched her preliminary hearing testimony a new charge would be warranted. In that circumstance, Lang properly could assert her constitutional right against self-incrimination in the face of a real threat of further prosecution. In short, when the prosecutor exercised his discretionary authority to charge Lang with perjury, his decision had multiple legal repercussions—among them, triggering various of Lang's constitutional rights including her privilege against self-incrimination. Conversely, had the prosecutor done nothing following the preliminary hearing, Lang would have been similarly situated with the dissent's "any other witness." See slip op. at 34.

The dissent likewise misfires in concluding the prosecutor's grant of immunity to Lang after charging her with perjury negates her privilege against self-incrimination. The dissent relies on the general rule that a grant of immunity is not a license to commit perjury. Though true, the proposition in its very generality fails to account for the peculiar circumstance where the government has already charged an individual with giving allegedly perjurious testimony and intends to place that individual in a position where he or she will face an additional perjury charge if he or she repeats the testimony in another proceeding. In that situation, the government would be actively and powerfully coercing a truthteller to renounce the truth—replicating the kind of fundamental governmental abuse the privilege against self-incrimination was intended to prevent.

Rather, the general proposition presumes individuals testifying with grants of immunity will adhere to the oath they take and will tell the truth. Carving out an exception from the grant of immunity to permit a prosecution for perjury based on that testimony simply puts in place a sanction to promote the presumption. The incentive is a reasonable one. And a contrary rule—immunizing perjury—would entice at least some witnesses to give false testimony.

Here, however, the prosecutor has jumbled up the incentives in a way that would punish a particular rendition of relevant events without regard to the truth or falsity of the rendition. And the rub is that we cannot determine whether Lang may be a truthteller or a perjurer. Given that forced agnosticism, we should not fall back on a generality applicable in common circumstances quite unlike those we face where the government has interceded in an exceptionally punitive fashion to condemn Lang as a perjurer for a rendition of events it finds disadvantageous in prosecuting Adams in this case. The grant of immunity, thus, fails of its basic purpose—to incentivize truthful testimony.

Again, the circumstances would be different if there were a sound legal basis at this juncture to conclude Lang committed perjury when she testified at the preliminary

16

hearing. We would have such a foundation if Lang had pleaded guilty to the perjury charge already lodged against her or a judge or jury had convicted her following a trial on that charge. Even compelling evidence of an out-of-court admission from Lang that she had lied during the preliminary hearing might be enough. But we have nothing of the sort from which to make a reasoned credibility determination.

The dissent also falls back on a pair of irrelevancies. First, the Court somewhat cryptically observed in *Apfelbaum* that "there . . . is no doctrine of 'anticipatory perjury,'" so a grant of immunity would not shield an individual intent on testifying falsely in the future. 445 U.S. at 131. Contextually, however, the comment doesn't have much bearing on Lang's situation. The Court noted that crimes typically require both a bad act and a bad intent. Perjury is such a crime. That's why a person who testifies honestly though inaccurately does not commit perjury. The Court linked its observation to the idea that a potential witness' intent to commit perjury would not itself create a real harm or danger triggering the privilege against self-incrimination in the first place. 445 U.S. at 131. But, as we have said, we are in no position to assess Lang's intent, and the prosecutor has already created the very real danger Lang will face an additional perjury charge. We, thus, confront something quite different and more complex than a hypothetical witness' unarticulated design to testify falsely notwithstanding a grant of immunity.

Second, the dissent points out that if Lang were forced to testify in Adams' trial under a grant of immunity, her testimony could not then be used in the case the prosecutor has already filed against her. Again, that's true. But it has nothing to do with the issue we have been asked to decide—whether Lang can be compelled to testify at Adams' trial under a grant of immunity when the State has announced that a repetition of her preliminary hearing testimony would support an additional perjury charge against her.

17

*Conclusion*

The district court correctly permitted Lang to assert her Fifth Amendment privilege not to testify at Adams' trial. The State's offer of statutory immunity under K.S.A. 22-3415 was insufficient in the face of its decision to charge Lang with perjury for her preliminary hearing testimony and the likelihood she would have given comparable testimony during the trial. We, therefore, affirm the district court on the specific issue the State has appealed.

Affirmed.

\* \* \*

ATCHESON, J., concurring:  One aspect of this most unusual case begs for some elaboration beyond the majority opinion:  The Ellis County District Court's evidentiary ruling on the effect of allowing Stephanie Lang to assert her constitutional right against self-incrimination in the criminal trial of Christopher Shawn Adams. In a bench ruling without much input from the parties, the district court concluded the State could not present Lang's preliminary hearing testimony and her out-of-court statements as evidence in Adams' trial. There appear to be weaknesses in that evidentiary ruling that we ought to explore further.

As the majority opinion outlines, the district court found that Lang could assert her right against self-incrimination, as guaranteed in the Fifth and Fourteenth Amendments to the United States Constitution, in the face of the prosecutor's decision to charge her with perjury based on her preliminary hearing testimony. And the district court held that the prosecutor's grant of statutory immunity to Lang was insufficient to overcome her constitutional protection, so she could not be compelled to testify at Adams' trial. We properly have affirmed those determinations.

18

The district court, however, concomitantly prohibited the State from presenting at Adams' trial both Lang's preliminary hearing testimony and her recorded statements to law enforcement officers that were admitted as evidence during the preliminary hearing. Although the district court's determinations are related, the correctness of the self-incrimination ruling does not guarantee the correctness of the evidentiary ruling. For whatever reason, the State did not challenge the evidentiary ruling in this interlocutory appeal.

I would have preferred to invite the parties to brief the district court's decision to bar the introduction of the preliminary hearing evidence at Adams' trial. As I explain, there is good reason to question that determination. But without briefing from the parties, we should not and really cannot definitively address the point. Judicial decision-making depends upon the sharpened debate of legal adversaries offering competing arguments on a disputed issue, and we at the very least tarnish due process if we sidestep that exchange to reach an issue the parties have not addressed. See *United States v. Cronic*, 466 U.S. 648, 655-56, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984) ("'The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.'") (quoting *Herring v. New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 45 L. Ed. 2d 593 [1975]); *GTE Sylvania, Inc. v. Consumers Union*, 445 U.S. 375, 382-83, 100 S. Ct. 1194, 63 L. Ed. 2d 467 (1980) ("The clash of adverse parties 'sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions.'"); *State v. Puckett*, 230 Kan. 596, 600-01, 640 P.2d 1198 (1982) (appellate court may raise and address issue "to serve the ends of justice" so long as parties have been given opportunity to brief matter); cf. *Trest v. Cain*, 522 U.S. 87, 92, 118 S. Ct. 478, 139 L. Ed. 2d 444 (1997) (suggesting "fairer . . . way home" calls for court to request supplemental briefing if it intends to "dispose[] of a case on a basis not previously argued").

19

We do, however, have the judicial authority to take up the district court's evidentiary ruling if we seek the parties' input. *State v. Parry*, 305 Kan. 1189, 1191-92, 390 P.3d 879 (2017). Neither of my colleagues wishes to take that step. I recognize our prerogative should be exercised sparingly and arguably almost never in run-of-the-mill civil actions in which private parties are fighting over money or equitable relief through lawyers of their choosing. But there are good reasons to do so here. First, the district court's evidentiary ruling is intertwined with its decision to allow Lang to assert her Fifth Amendment privilege. Second, there are fair arguments rooted in Kansas law to doubt the evidentiary ruling. If the ruling were erroneous, its correction would likely obviate much of the State's distress over Lang's assertion of the privilege and would likely render this appeal moot, meaning we would not have to venture into the constitutional thicket that has enveloped us. See *Lyng v. Northwest Indian Cemetery Prot. Assn.*, 485 U.S. 439, 445-46, 108 S. Ct. 1319, 99 L. Ed. 2d 534 (1988) (Courts should "avoid reaching constitutional questions in advance of the necessity of deciding them."); *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 658, 367 P.3d 282 (2016).

Because the evidentiary issue will remain open for reconsideration on remand, I offer my observations recognizing full well they may be off the mark, especially in the absence of the parties' studied legal arguments.

When the district court permitted Lang to assert her Fifth Amendment privilege, she became an unavailable witness under K.S.A. 60-459(g)(1). Lang's preliminary hearing testimony, therefore, fit within the hearsay exception in K.S.A. 60-460(c)(2). In precluding the State from offering Lang's preliminary hearing testimony at trial, the district court appeared to reason that the prosecutor presumably considered the testimony to be false, since it formed the basis for the perjury charge. So, in turn, the district court concluded the prosecutor would be acting improperly in presenting the testimony for the jurors' consideration. And without the preliminary hearing testimony, the prosecutor

20

could not offer Lang's out-of-court statements to the law enforcement officers inculpating Adams under the hearsay exception in K.S.A. 60-460(a).

The premise of the district court's evidentiary ruling seems faulty because parties may impeach witnesses they call. See K.S.A. 60-420; *Bicknell v. Kansas Department of Revenue*, 315 Kan. 451, 503, 509 P.3d 1211 (2022) ("Parties may even impeach their own witnesses at trial through their prior inconsistent statements."); *State v. Farley*, 225 Kan. 127, 131-32, 587 P.2d 337 (1978) (The State could call witnesses anticipating they would recant out-of-court statements they had given inculpating the defendant and, in turn, could then offer those inculpatory statements.); *State v. Ford*, 210 Kan. 491, 495-96, 502 P.2d 786 (1972). If Lang's preliminary hearing testimony were admitted at trial because of her unavailability, the State could then offer her out-of-court statements admitted at the preliminary hearing as substantive evidence. They would fall within the hearsay exception in K.S.A. 2023 Supp. 60-460(a). We may reasonably assume the State would invite the jurors to treat Lang's out-of-court statements inculpating Adams as credible evidence over her preliminary hearing testimony that pulled back from those statements.

The *Ford* decision is particularly instructive. A witness testified at trial in a way that exculpated Defendant Theodore Ford, but the State admitted inculpatory statements the witness had given earlier to law enforcement investigators. There was a mistrial, and the State could not locate the witness for the retrial. Over Ford's objection, the district court allowed the State to present the witness' testimony from the first trial and the out-of-court statements. The Kansas Supreme Court affirmed, recognizing that the witness' out-of-court statements "could well be viewed as an integral part of his testimony" and that "his testimony at the first trial would have been incomplete at best" without those statements. 210 Kan. at 496. The court distilled the rule this way: "Where the recorded testimony of an unavailable witness given at a former trial is properly admitted into evidence, it is not error to admit also a prior contradictory statement of such witness with

21

which he was confronted and about which he was cross-examined at the former trial." 210 Kan. 491, Syl. ¶ 3. The rule would seem to apply here.

Likewise, Adams would not have a valid Confrontation Clause objection to the State presenting Lang's preliminary hearing testimony and her out-of-court statements to the police for the jury's consideration. The out-of-court statements were testimonial, triggering Adams' right under the Fifth Amendment to confront and question Lang about them. See *Crawford v. Washington*, 541 U.S. 36, 52-53 125 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). But testimonial statements of an unavailable witness may be admitted against a criminal defendant at trial if the defendant had an earlier opportunity to confront the witness. 541 U.S. at 68 ("Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."). At the preliminary hearing, Adams—through his lawyer—had an ample opportunity to question Lang about the relevant events and her statements to the law enforcement officers about those events. That opportunity satisfied his right to confront Lang, and he took advantage of the opportunity.

\* \* \*

ARNOLD-BURGER, C.J., dissenting: I respectfully dissent. I believe the district court erred when it refused to compel Stephanie Lang to testify in Christopher Shawn Adams' criminal trial once she was granted use and derivative use immunity from the State. I would reverse the district court's decision and remand the case for trial. I would order that Lang be compelled to testify about the events that gave rise to these charges, although her testimony could not be used against her in her pending perjury case.

To fully understand the context of the decisions made by the State, Lang, the district court, and the majority, I believe it is necessary to set forth more than just the barebones factual recitation by the majority. So I will begin with more facts for context.

22

There is no dispute that Richard Diehl was "sucker punched" in the lower teeth and jaw—busting his jaw, fracturing his nose, and breaking his four bottom teeth, all requiring surgery. He did not see or recognize the person who hit him. He hit the ground and asked those surrounding him what had happened. Diehl believes he blacked out due to the force of the blow.

No one at the scene could identify who hit Diehl. Yet the descriptions were consistent—a shorter male, "maybe 5'2"; had chinstrap-style facial hair, goatee; and possibly red colored hair." One witness indicated that the male was accompanied by a "female wearing a gray sweatshirt with curly styled hair."

While officers were talking to witnesses, a domestic disturbance was reported at a nearby location. Officers responded to that scene.

Upon arrival Shilo Meska told Sargent Brandon Hauptman that he had reported the disturbance. Meska stated that he heard an argument behind his house and went to see what was going on. He observed Adams and Lang fighting and tried to break them up. As Meska tried to get in between them, Adams punched Meska in the face.

Master Patrol Officer Derick Nordell next contacted the female victim, Lang. Adams and Lang lived together and had been in a dating relationship for about a year. Lang told Nordell that she and Adams argued as they were walking home from the Sip and Spin. Adams grabbed her and threw her to the ground. Nordell noted that Lang had a visible scratch and a bruise had begun to form where she hit the ground and fell on her right elbow. She revealed that she called 9-1-1 as they were walking home through a cemetery.

Nordell asked Lang if Adams had been in a fight at the Sip and Spin and Lang said he had. She stated that she had been talking to Diehl and Diehl offered them a ride home. Then, out of nowhere, Adams punched Diehl in the face causing him to fall to the ground. Lang fit the description given by witnesses as the person accompanying the man that hit Diehl.

Hays Police Corporal Dakota Reese arrived at the couple's residence and found Lang in the back of Officer Nordell's patrol car. He approached Lang and started asking her questions about what happened at Sip and Spin. The conversation was recorded on both the in-car video in Nordell's patrol car and on Reese's body camera. Both recordings were admitted during the preliminary hearing in the case. Lang advised Reese that she saw Adams "punch that man." She was standing next to Diehl at the time and walked away after it happened. She said she was mad at Adams for hitting Diehl.

There is also no dispute that Lang had been drinking that evening. As she was writing out her statement, Lang told Reese that she did not wish to pursue domestic battery charges against Adams and was starting to recant some of her prior statements. Reese advised her that regardless of the domestic battery charges, there was still a battery charge related to hitting Meska and an aggravated battery charge related to hitting Diehl that would be filed. Reese advised her that it would not be a good idea to have Adams around her children.

Officer Reese noted that apart from height—Adams was 5'7"—Adams otherwise matched the description the witnesses gave of the person who struck Diehl.

*A. Adams is charged with aggravated battery against Diehl.*

As promised, the State charged Adams with one count each of aggravated battery, domestic battery, and battery. The alleged victims of the crimes were Diehl, Lang, and Meska, respectively.

*B. Lang tells a different story at the preliminary hearing.*

Lang testified at Adams' preliminary hearing. She denied that she saw Adams punch anybody in the face. She said the officers had threatened to take her kids away and she may not have been truthful with them that evening. She relayed that she was very intoxicated at the time and although she remembers arguing with Adams, she did not recall the argument ever becoming physical. She later adjusted her testimony and said she simply did not remember what happened that evening. She said she had been drinking for "almost 12 hours" when the police questioned her. She remembered "checking the pulse of someone laying on the ground and then walking away." She said she did that because she is a nurse, and he was unconscious—but breathing. She assumed they were standing close to the man when he went to the ground. She testified she did not leave Sip and Spin with Adams. She stated she did not even see him again until the next morning. When asked whether it would surprise her to learn she screamed for help during her 9-1-1 call, Lang said she would not be surprised by that because she had been walking alone by a cemetery a few hours after midnight. Finally, she testified that she tried to see her statement the next day to correct it but was denied that opportunity.

*C. The district court finds Lang's testimony to be untruthful.*

In closing, the State argued:

25

"[I]t's complete and total nonsense that Ms. Lang is now testifying today that she doesn't remember anything. She knows what happened that night, and she gave statements of what happened that night that are part of the recording that was admitted into evidence. She identified [Adams] as being the one who hit Richard Diehl in the face breaking his jaw and teeth."

Ultimately, the district court agreed with the State. It found the testimony of Diehl and Reese believable, while it specifically found Lang's to be untruthful. The district court found it implausible that Lang would remember checking a man's pulse but hardly anything else. And so the district court found probable cause to bind Adams over on the felony charge of aggravated battery.

### D. *The State charges Lang with perjury.*

Following the preliminary hearing, the State charged Lang with perjury, or, in the alternative, interference with law enforcement. Its theory of the case was that Lang either lied during the preliminary hearing (perjury) or she lied to police at the time she spoke to them (interference with law enforcement).

### E. *Lang reveals her plan to invoke her Fifth Amendment privilege against self-incrimination at Adams' trial.*

A few days before Adams' criminal trial was scheduled to begin, Lang's attorney notified the district court that Lang planned to invoke her Fifth Amendment privilege against self-incrimination if called as a witness due to her pending perjury charge. Lang's counsel explained that Lang would invoke her Fifth Amendment privilege *even if* the State offered use and derivative use immunity because such immunity would not be coextensive with her privilege against self-incrimination under the circumstances.

26

On the day of trial, the State provided the district court with the written grant of use and derivative use immunity. As promised, despite the grant of immunity, Lang told the district court she planned to invoke her Fifth Amendment privilege and not testify at trial.

*F. The district court declares Lang unavailable, declines to compel her to testify, and excludes her preliminary hearing testimony from Adams.*

After considering the positions of both Lang and the State, the district court found that Lang was an unavailable witness. In so finding, the district court concluded that the State could not grant immunity for perjury, including "post perjury, current perjury, or future perjury," and Lang had a Fifth Amendment privilege against self-incrimination. Accordingly, the court would not force her to testify and, inexplicably, the district court prohibited the State from introducing Lang's statements to law enforcement and her preliminary hearing testimony even though she had been effectively declared an unavailable witness. See *State v. Showalter*, 318 Kan. 338, Syl. ¶ 3, 543 P.3d 508 (2024) (Hearsay testimonial evidence in criminal prosecutions is admissible under the Confrontation Clause of the Sixth Amendment when the witness is unavailable, and the accused had a prior opportunity to cross-examine the witness.). The district court then granted the State's request for a continuance to pursue an interlocutory appeal.

The next day, the district court held another hearing that allowed the State to make a proffer of evidence. The State began by arguing that the district court's ruling declaring Lang an unavailable witness effectively suppressed the State's evidence in the case because the district court ruled Lang did not have to testify *and* excluded her out-of-court statements. The State then proffered that there would have been two police officers, including Reese, that would have testified that Lang made statements to them during their investigation. Those statements were recorded, which the State planned to use as exhibits during trial.

27

The State asserted that the video recordings depicted Lang identifying Adams as her boyfriend and saying that he got into a fight when they were leaving the bar. The video also depicted some of Lang's bodily injuries, which she sustained after Adams grabbed her and threw her to the ground. Similarly, the State asserted that the audio recordings depicted Lang's interactions with Reese. During that conversation, Lang said that Adams grabbed her by the arm. The audio recordings also depicted Lang getting emotional about the possibility of Adams facing charges at which point she began diminishing her statements and recanting.

The State also proffered that it planned to call one of Lang's sons to testify. The State believed the son would have testified to overhearing statements made by Lang during the night of the underlying events. The State believed the son would also have testified about overhearing another conversation between Adams and Lang about a month after the underlying events where Lang asked Adams why he hit the man in the bar and Adams provided an explanation. In sum, the State argued that, because this evidence had been suppressed, the State could no longer prosecute its case. I agree with the majority that there was a proper basis to accept this interlocutory appeal.

THE DISTRICT COURT ERRED BY NOT COMPELLING LANG'S TESTIMONY

The State argues the district court erred by concluding that the State's grant of use and derivative use immunity to Lang was not coextensive with her Fifth Amendment privilege against self-incrimination.

The majority finds the district court was correct—that because the prosecutor charged Lang with perjury for her preliminary hearing testimony, she faced the "substantive and immediate prospect of a new criminal charge" if she testified in the same manner at trial as she did at preliminary hearing. Slip op. at 8. Therefore, she "had a Fifth Amendment privilege to avoid placing herself in that position." Slip op. at 8. I agree

28

the Fifth Amendment protects Lang from being compelled to testify at trial in a way that could be used to bolster the State's pending perjury case against her. But where I part company with the majority is its belief that Lang can properly invoke the Fifth Amendment privilege to avoid a subsequent perjury charge based on the testimony she may give at trial. Slip op. at 7-8. This is an interpretation of Fifth Amendment jurisprudence that is both unsupported by the caselaw and overly broad.

## A. Truth or consequences are at the core of our system of justice.

"All oaths and affirmations alike subject the party who shall falsify them to the pains and penalties of perjury." K.S.A. 54-105.

The above requirement has been in our Kansas state statutes since statehood. Any witness who testifies subjects themself to the possibility they could be charged with perjury. It is clearly a statute that is intended to place the fear of punishment front and center in the mind of any witness who may be tempted to lie.

"[T]he oath or affirmation required of a witness nevertheless constitutes a strong reminder that he has a special obligation to testify truthfully and that he is subject to punishment should he fabricate. The ceremony in whatever form must embrace the commitment to tell the truth out of fear of punishment. [Citations omitted.]" *State v. Caraballo*, 330 N.J. Super. 545, 555, 750 A.2d 177 (2000).

Witnesses are advised every day in courtrooms around the country in both civil and criminal trials about the importance of testifying truthfully. It is not at all unusual for a witness to be reminded by the judge or the attorney doing the questioning that they could face perjury charges if they violate their oath to tell the truth. This is often, though not always, used as a strategy by counsel when counsel expects that the witness may be tempted to lie—requiring a reminder. So threatening a witness with the real possibility that they may be criminally charged if they do not testify truthfully—either in the

29

courtroom or prior to trial—does not allow the witness to assert a Fifth Amendment privilege against testifying. If that were enough, the search for the truth in courtrooms around this country would come to a screeching halt. See *In re Michael*, 326 U.S. 224, 227, 66 S. Ct. 78, 90 L. Ed. 30 (1945) ("All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth.").

*B. Lang has no privilege against self-incrimination for untruthful testimony, regardless of whether the core of the testimony is immunized.*

Lang seeks to shield herself from testifying because she asserts that if she testifies the same way she did in the preliminary hearing—testimony that at least one fact-finder has already found to be disingenuous—she may be prosecuted for it. It is as basic as that.

As the majority notes, the United States Supreme Court has furnished a "'basic test'" for invoking the privilege against self-incrimination: "'[W]hether the claimant is confronted by substantial and "real," and not merely trifling or imaginary, hazards of incrimination.'" *United States v. Apfelbaum*, 445 U.S. 115, 128, 100 S. Ct. 948, 63 L. Ed. 2d 250 (1980) (quoting *Marchetti v. United States*, 390 U.S. 39, 53, 88 S. Ct. 697, 19 L. Ed. 2d 889 [1968]). Slip op. at 7. The majority then concludes that Lang could invoke the Fifth Amendment to avoid testifying at trial based on the prosecutor's charging decision because she "faced about as clear a hazard of being prosecuted anew for her consistent testimony as might be imagined." Slip op. at 8. In other words, she faces a real possibility of being charged anew with perjury or with interference with a police officer if she testifies the same way she did in the preliminary hearing. By allowing Lang to shield herself in this way, the majority makes a critical error by discounting relevant caselaw discussing the Fifth Amendment privilege against self-incrimination as applied to a potential perjury charge. And *Apfelbaum* is instructive.

In *Apfelbaum*, the defendant was compelled to testify after being given a grant of immunity regarding his involvement in a staged robbery at a car dealership. During his testimony he denied telling FBI agents that he had loaned $10,000 to one of the owners of the dealership. And he denied that he had gone looking for the same individual while on a trip in Ft. Lauderdale. Both statements were false. So Apfelbaum was charged with knowingly making these false statements. The prosecution introduced a significant amount of the otherwise immunized testimony in Apfelbaum's perjury trial for contextual purposes. The Third Circuit reversed Apfelbaum's conviction, holding that the Government could only use the "Corpus delicti" or "core" of the statements made under a grant of immunity to support a perjury charge. *United States v. Apfelbaum*, 584 F.2d 1264, 1265 (3d Cir. 1978) (relying on *Kastigar v. United States*, 406 U.S. 441, 92 S. Ct. 1653, 32 L. Ed. 2d 212 [1972]).

The United States Supreme Court granted certiorari to address a split among the circuit courts on that issue, which consisted of three conflicting views: (1) the corpus delicti approach recognized by the Third and Seventh Circuits; (2) allowing introduction of false immunized testimony only, the view recognized by the Second and Tenth Circuits; and (3) allowing introduction of any immunized testimony, the view recognized by the Sixth and Eighth Circuits. See *Apfelbaum*, 445 U.S. at 119 n.5 (discussing holdings). Writing for the Court, Justice Rehnquist concluded that the federal immunity statute "makes no distinction between truthful and untruthful statements made during the course of the immunized testimony. Rather, it creates a blanket exemption from the bar against the use of immunized testimony in cases in which the witness is subsequently prosecuted for making false statements." 445 U.S. at 122. In other words, the Court rejected the limitation placed on the use of immunized testimony by the Third Circuit in reversing Apfelbaum's conviction.

Elaborating on its rationale, the Court then addressed several flaws in the appellate court's reasoning. To begin with, the Court explained that the proper focus for

31

determining whether a grant of immunity is coextensive with the Fifth Amendment does not require treating the witness as if they had remained silent. 445 U.S. at 125-27. Rather, the focus should be on the "protections conferred by the privilege," which reflects "the fact that immunity statutes and prosecutions for perjury committed during the course of immunized testimony are permissible." 445 U.S. at 127. Yet, the perjury exception in 18 U.S.C. § 6002 was not without limits precisely because immunized testimony "remains inadmissible in all prosecutions for offenses committed prior to the grant of immunity that would have permitted the witness to invoke his Fifth Amendment privilege absent the grant." *Apfelbaum*, 445 U.S. at 128; see also *United States v. DeSalvo*, 26 F.3d 1216, 1220-21 (2d Cir. 1994) (recognizing that *Apfelbaum* did not change the general rule that immunized testimony cannot be used in a prosecution for perjury committed *prior* to the grant of immunity).

Then, as noted above and by the majority, the Court reaffirmed the basic test for assessing the scope of the Fifth Amendment privilege as looking to "'whether the claimant is confronted by substantial and "real," and not merely trifling or imaginary, hazards of incrimination.'" *Apfelbaum*, 445 U.S. at 128 (quoting *Marchetti*, 390 U.S. at 53); slip op. at 6. Yet the Court then concluded that the Fifth Amendment did not prevent using Apfelbaum's immunized testimony "because, at the time he was granted immunity, the privilege would not have protected him against false testimony that he later might decide to give." 445 U.S. at 130. In other words, "a future intention to commit perjury or to make false statements . . . is not by itself sufficient to create a 'substantial and "real"' hazard that permits invocation of the Fifth Amendment." *Apfelbaum*, 445 U.S. at 131 (citing *Rogers v. United States*, 340 U.S. 367, 71 S. Ct. 438, 95 L. Ed. 344 [1951]; *Brown v. Walker*, 161 U.S. 591, 16 S. Ct. 644, 40 L. Ed. 819 [1896]); see also *Brogan v. United States*, 522 U.S. 398, 404, 118 S. Ct. 805, 139 L. Ed. 2d 830 (1998) ("[N]either the text nor the spirit of the Fifth Amendment confers a privilege to lie.") (citing *Apfelbaum*, 445 U.S. at 117).

As the United States Supreme Court also observed in *Glickstein v. United States*, 222 U.S. 139, 142, 32 S. Ct. 71, 56 L. Ed. 128 (1911):

> "[I]t cannot be conceived that there is power to compel the giving of testimony where no right exists to require that the testimony shall be given under such circumstances and safeguards as to compel it to be truthful. In other words, this is but to say that an authority which can only extend to the licensing of perjury is not a power to compel the giving of testimony. Of course, these propositions being true, it is also true that the immunity afforded by the constitutional guaranty relates to the past, and does not endow the person who testifies with a license to commit perjury."

Our statutes define perjury as intentionally and falsely testifying to any material fact in any court proceeding after being placed under oath. K.S.A. 21-5903. And like the federal statute at issue in *Apfelbaum*, Kansas law exempts perjury prosecutions from the general prohibition against using immunized testimony or evidence derived from such testimony against a witness. K.S.A. 22-3415(d) ("No immunity shall be granted for perjury . . . which was committed in giving such evidence."). Contrary to the district court's conclusion, K.S.A. 22-3415(d) did not prevent the State from granting Lang immunity for her trial testimony because the grant of immunity would only apply to her prior conduct. Rather, the exception reflects the *Apfelbaum* Court's recognition that perjury prosecutions based on immunized testimony are specifically allowed under the Fifth Amendment.

Now, the majority agrees with Adams that the prosecutor's strategy here created a real and immediate danger of new perjury charges, thus permitting her to invoke her right against self-incrimination. Slip op. at 10-11. But as *Apfelbaum* shows, the Fifth Amendment jurisprudence contains "no doctrine of 'anticipatory perjury.'" 445 U.S. at 131. Granted, the procedural posture of this case differs from *Apfelbaum*, in that Lang is not challenging a perjury conviction based on testimony given under a grant of immunity. But the question before this court—whether Lang can properly invoke the Fifth

33

Amendment to avoid giving false testimony in the future—is nonetheless answered by *Apfelbaum*.

Lang asserted her right against self-incrimination because she feared her testimony would be used against her in her pending case and she feared being prosecuted in the future for perjury based on that same immunized testimony. But the later fear is no different from the typical fear facing any other witness. While she may have been better off remaining silent, that is merely a benefit derived from invoking the Fifth Amendment and not a protection conferred by the privilege against self-incrimination. 445 U.S. at 126-27; see also *State v. Morales*, 788 N.W.2d 737, 750 (Minn. 2010) (holding witness who was granted use immunity did not have a valid Fifth Amendment privilege based on fear of a perjury prosecution).

So, to sum up, the Fifth Amendment does not protect individuals from prosecution for perjury committed while under or after a grant of immunity. Thus, Lang cannot assert such a privilege to avoid testifying in fear of future perjury charges based on her immunized testimony. Stated another way, even when granted immunity, a witness must still testify truthfully or face sanctions, whether that be contempt findings or new charges. So the chance that Lang could be charged with perjury, for any untruthful testimony in the criminal trial, does not justify exercising her Fifth Amendment privilege against self-incrimination and avoiding compelled testimony in Adams' trial.

*C. Lang can assert her privilege against self-incrimination only as it relates to her pending perjury charges.*

The purpose of immunity statutes is to accommodate the imperatives of the Fifth Amendment privilege while recognizing the government's legitimate need to compel testimony from citizens. See *Kastigar v. United States*, 406 U.S. 441, 445-46, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972). The State can remove the fear of incrimination and

compel testimony if it grants the witness immunity in return for the witness' testimony. But not all grants of immunity will satisfy the constraints of the right against self-incrimination. There are three recognized types of immunity: (1) "'transactional,'" (2) "'use and derivative use,'" and (3) "'use.'" *Cabral v. State*, 19 Kan. App. 2d 456, 460, 871 P.2d 1285 (1994).

"'Transactional' immunity protects the witness from prosecution for offenses to which the compelled testimony relates. This type of immunity is broader than the constitutional privilege against self-incrimination and need not always be granted, although it does, of course, constitute adequate immunity." 19 Kan. App. 2d at 460-61.

"'Use and derivative use' immunity protects the witness from the use of compelled testimony and evidence derived therefrom. It is coextensive with the constitutional privilege against self-incrimination and is therefore a sufficient grant of immunity to compel self-incriminatory testimony. On the other hand, mere 'use' immunity, which only prevents the prosecution from using the compelled testimony in any criminal proceeding, is not constitutionally adequate since it does not prevent prosecuting authorities from making derivative use of the fruits of a witness' compelled testimony by obtaining investigatory leads from it." 19 Kan. App. 2d at 461.

The United States Supreme Court has held that if the government wants to compel testimony from a witness claiming the Fifth Amendment privilege against compulsory self-incrimination, it must grant the witness at least use and derivative use immunity. *Kastigar*, 406 U.S. at 453-54. Here, the State granted Lang use and derivative use immunity.

But the district court held that the immunity granted was not coextensive with the scope of Lang's Fifth Amendment privilege, so the court would not compel her testimony Moreover, even though declared an unavailable witness, the district court would not allow her preliminary hearing testimony to be admitted. The court elaborated in response

35

to protests from the State, that because the judge had found she lied at preliminary hearing "[w]e certainly don't want to put lies in front of the jury. So we can't use her testimony from prelim." So let's break that down a little.

Courts have often described a requirement that whatever immunity is granted to a witness it must be coextensive with the scope of the privilege. Coextensive is defined as "having the same extent in time or space." Webster's New World College Dictionary 290 (5th ed. 2018). So the immunity must protect the same conduct that the Fifth Amendment would protect under the same circumstances. Generally, use and derivative use immunity are coextensive with the Fifth Amendment—and the United States Supreme Court has so held. *Kastigar*, 406 U.S. at 453. And important here, the immunity need not be broader than the Fifth Amendment protections granted a witness. 406 U.S. at 453.

I think we can all agree that if Lang had not been charged with anything, she could not refuse to testify because the judge and prosecutor thought she was lying at preliminary hearing—even if they expressed their beliefs on the record. She would have no Fifth Amendment privilege against perjuring herself again at the trial—a new crime. A witness has no constitutional privilege that allows them to present false testimony in court. And as we have already established, a witness cannot be granted immunity for perjury.

So rather than continue to argue over the scope of Lang's Fifth Amendment privilege, the prosecutor offered to dismiss the perjury charges against Lang with prejudice so that the trial could proceed. The court found that would not be enough. The court reasoned that "because if she testifies in a manner [at trial] that you believe is perjury, you can't grant immunity for that, and she could still be charged with her testimony today for perjury." The court went on to state that to compel Lang's testimony, the State would have to "[c]ompletely resolve her case, whether that be a plea or by trial. You are going to have to resolve her case before she can be a witness in this case." The

State pointed out the inconsistency in such a position—the State could not dismiss the case and compel Lang's testimony, but if her case was resolved by plea or trial, they could compel her testimony. The prosecutor emphasized that he was not granting her immunity from perjury, he was simply agreeing that any statements she made at trial could not be used against her at her perjury trial. "I'm expected to prove my perjury case without any statement from this trial."

Here, Lang has been charged with perjury or interference with a law enforcement officer for her testimony at the preliminary hearing. In support of that charge, the State is claiming either she lied to police during their investigation on the night of the incident or she lied during her testimony at the preliminary hearing. Lang has now been subpoenaed to testify in Adams' criminal trial where, we are speculating that, she will offer the same testimony as given in the preliminary hearing. Thus, Lang invoked her privilege against self-incrimination, partly in fear that her testimony will be used to bolster the existing perjury or interference charges—an understandable and well-advised strategic move on Lang's part.

But as discussed above, once the State granted Lang immunity any testimony Lang gives under the grant of immunity at Adams' trial would be inadmissible during a prosecution for offenses committed before the grant of immunity. *Apfelbaum*, 445 U.S. at 128. More recently, this court reiterated that, by granting a witness use and derivative use immunity, "the State could not use his trial testimony, if true, to convict him of any crime, including perjury for any contrary statements made during his preliminary examination." *State v. Martinez-Diaz*, 63 Kan. App. 2d 363, 379, 528 P.3d 1042 (2023). So if she testifies differently than she testified at the preliminary hearing—for example, if she says she did see Adams hit Diehl or she does not remember but she has no reason to doubt what she said then—that testimony could not be used to show Lang committed perjury at the preliminary hearing. Thus, the State's grant of immunity prevented the State from using any of Lang's trial testimony against her in *her* pending criminal case.

37

Whether her testimony at Adams' trial is the same or different or whether it is truthful or deceitful, will have to stand on its own. And, contrary to the majority's mischaracterization of my analysis, I offer no opinion related to the truthfulness of her prior testimony, nor does my analysis rest on any such "unwarranted premise." Slip op. at 13.

And contrary to the district court's finding, the use and derivative use immunity provided by the State did not afford Lang *less* protection than her Fifth Amendment privilege against compulsory self-incrimination. In fact, I would assert it is the district court, Lang, and the majority that attempts to require a *broader* grant of immunity than is required to compel Lang's testimony. This court has stated that for a grant of immunity to be coextensive with the Fifth Amendment, "the immunity must insulate the witnesses as to all *prior* criminal conduct." (Emphasis added.) *State v. Brewer*, 11 Kan. App. 2d 655, 660, 732 P.2d 780 (1987) (citing *Kastigar*, 406 U.S. 441; *In re Birdsong*, 216 Kan. 297, 299-300, 532 P.2d 1301 [1975]), *abrogated on other grounds by State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006). The use and derivative use immunity provided by the State afforded Lang the necessary insulation. It protected her from the use of her testimony at Adams' trial against her during her own trial for a prior perjury.

In sum, the *Kastigar* Court held that "immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." 406 U.S. at 453. Here, neither the district court nor Lang nor the majority provide any support for the notion that the principle does not apply when a witness has been charged with perjury. As a result, the district court erred by finding that Lang retained her Fifth Amendment privilege to testify despite the State's grant of immunity.